CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

JUL 02 2009

JOHN F. CORCORAN, CLERK
BY: /s/ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| DR. HERBERT R. PUTZ, et al., | CASE NO. 3:09CV00003 |
| Plaintiffs, | |
| v. | REPORT AND RECOMMENDATION |
| MICHAEL H. GOLDEN, et al., | |
| Defendants. | By: B. WAUGH CRIGLER |
| | U.S. MAGISTRATE JUDGE |

This action is before the undersigned in accordance with an Order entered on May 7, 2009 by the presiding District Judge. The Order granted the defendants' motion to reconsider the court's Memorandum Opinion and Order entered on May 5, 2009 denying their February 27, 2009 motion to dismiss for lack of personal jurisdiction and directed the undersigned to conduct an evidentiary hearing and submit to the presiding District Judge proposed findings of fact, conclusions of law, and a recommended disposition of defendants' motion to dismiss. For the following reasons, the undersigned RECOMMENDS that the presiding District Judge once more deny the defendants' February 27, 2009 motion to dismiss.

**PROCEDURAL BACKGROUND**

On January 27, 2009, plaintiffs Dr. Herbert R. Putz and Panonia Realty Corp. filed their complaint in this Court against defendants alleging two counts: (1) breach of contract and (2) constructive fraud. On February 27, 2009, the defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. Plaintiffs filed an Opposition on March 24, 2009.

On May 5, 2009, the presiding District Judge entered an Order and Memorandum Opinion ("Opinion") in support thereof denying defendants' motion to dismiss on the basis that defendants

had sufficient contacts with Virginia to satisfy Virginia's long-arm statute and the Due Process Clause of the United States Constitution to establish personal jurisdiction over them in this action.

On May 7, 2009, defendants moved to reconsider the May 5, 2009 decision denying the motion to dismiss. Defendants argued that the May 5, 2009 Order erroneously stated no request for a hearing had been made, and that genuine issues of fact existed warranting such a hearing. By Order entered on May 7, 2009, the presiding District Judge granted the motion to reconsider and referred the case to the undersigned to conduct an evidentiary hearing, thereafter rendering a report and recommendation concerning the disposition of the motion.

Evidentiary proceedings were held before the undersigned on May 28, 2009 and June 23, 2009.

**FACTS AS FOUND BY DISTRICT JUDGE**

Most of the facts relevant to these proceedings were set forth by the presiding District Judge in his Memorandum Opinion ("Opinion") entered on May 5, 2009. There is no dispute that defendants, Michael H. and Suzanne C. Golden ("Goldens"), were and remain the owners of eighteen shares of Societe Civile Immobiliere Paepaepupure ("SCIP"), a real estate partnership which acquires and constructs residential units on property acquired in Paepaepupure. Paepaepupure is located in Bora Bora, French Polynesia. SCIP bought residential property on behalf of its partners and then issued stock in the partnership representing specific properties. At some time prior to 1987, the Goldens owned SCIP shares #206 and #224 which were understood to represent ownership of Bungalow #12.

On or about March 23, 1987 and March 28-29, 1987, the Goldens signed a purchase and sale agreement with an addendum thereto in which they agreed, *inter alia*, to transfer to the

2

plaintiff, Dr. Herbert R. Putz ("Putz") 18 shares of SCIP stock for an agreed price of $117,500. (June 23, 2009, Joint Exhibit, Tab #1, REAL ESTATE PURCHASE AND SALE AGREEMENT and ADDENDUM ONE TO REAL ESTATE PURCHASE AND SALES AGREEMENT (hereafter referred to either as "Agreement" or "Addendum" as the context compels.))[1] According to the agreement and its addendum, the Goldens agreed that they took on the duty to "arrange that the Board of Directors [of SCIP] will approve the transfer of the stocks as required by the By-Laws of the Corporation." (ADDENDUM, ¶ 4.)[2] The Goldens then transferred their SCIP interests to Panonia, an entity in which they held 100% ownership and, in turn, transferred all the interests in Panonia to Putz. Putz completely performed his obligations under the contract, including paying the $117,500 to the Goldens.

Over the next 18 years, Putz allegedly has paid $175,151 in SCIP dues necessary to avoid relinquishment of ownership rights under the SCIP by-laws together with $25,000 in repairs to the premises. In addition, Putz relocated both himself and the principal place of Panonia's business to Orange County, Virginia, which is in the Western District of Virginia. Prior to this relocation, no party to this action had any contact with Virginia.

During this 18-year period, both sides operated under the belief that owners of SCIP stock were entitled to redeem those shares for the actual title to property which the shares represented. On April 17, 2003, Putz attempted to redeem the 18 shares of SCIP shares for the title to

---

[1] The first page of the agreement actually provided that the Buyer (Putz) agreed "to buy" and the Seller (Golden) agreed "to sell... the property known as Bungalow number twelve (12)..." Agreement, p. 1.

[2] Interestingly, ¶ 4 of the initial Agreement also provided that the "Title to the property is to be free of all encumbrances."

3

Bungalow #12. SCIP denied Putz's attempt to redeem his stock certificates, refusing to recognize the validity of the transfer of SCIP shares to Panonia and, in turn, the transfer of all interest in Panonia to Putz.

Panonia filed a lawsuit in a French Polynesian court to force SCIP to convey title in the bungalow to Putz.[3] At some point, Putz informed the Goldens that they had not properly transferred the shares in SCIP, as required by their 1987 contract, whereupon the Goldens agreed to assist. Based on the record before the District Judge, he found that Michael Golden executed an affidavit dated May 31, 2005 which was intended to be used by Putz in the Polynesian court. In the affidavit, Golden affirmed the sale of the SCIP shares in the bungalow to Panonia, confirmed that the transaction had been approved by SCIP management and acknowledged that all the interests in Panonia held by the Goldens had been transferred to Putz. (Complaint, Plaintiffs' Exhibit B, Affidavit, ¶¶ 4-7.)[4] Attached to the original affidavit was a hand-written letter from Michael Golden to the SCIP Board of Directors dated April, 16, 1987 putting the Board on notice of the sale to Putz, and indicating the steps that would be taken *viz* his position on the Board consistent with that sale. Michael Golden then transmitted the representations set forth in the affidavit and the "Annex" to Putz in Orange County, Virginia, where Putz was domiciled and Panonia had its principal place of business.

---

[3]The undersigned will defer a discussion of the District Judge's findings concerning the Polynesian litigation and the evidence submitted on June 23, 2009 concerning the results of that litigation to a later section of this Report and Recommendation.

[4]Defendants did not object to the court's taking judicial notice of the affidavit, but offered that the complete document included "Annex 2" as incorporated by ¶ 4 of the affidavit. With consent of the plaintiffs, "Annex 2" was received as an exhibit to be considered as incorporated by reference into the affidavit.

4

It was this action by Mr. Golden which provided the basis for the District Judge's conclusion that the defendants had subjected themselves to the *in personam* jurisdiction of the courts of the Commonwealth, including the federal courts sitting in a diversity case. Specifically, the court held that the defendants' transmission of these representations to Putz in Virginia was "purposefully directed . . . toward Virginia and established sufficient 'minimum contacts' such that they reasonably could have anticipated being sued in Virginia court by a Virginia citizen and resident over a *contractual obligation that allegedly remains unfulfilled and, if performed, will require at least partial performance in Virginia*." (Opinion at 11(emphasis added).)

**EVIDENCE ADDUCED AT HEARINGS**

By agreement of the parties, plaintiffs produced the bulk of their hearing evidence by way of proffer. To the extent defendants objected to the proffer, the court permitted defendants to proffer countervailing evidence.

Plaintiffs essentially rested on the evidence found by the District Judge and as recited above. Plaintiffs further proffered that, during the pendency of the case before the French Polynesian trial court, Putz and Michael Golden telephonically discussed what could be done to effectuate transfer of title. According to Putz's proffer, Golden agreed to "prepare and execute" an affidavit and, then, return it to Putz in Virginia, who, in turn, would make use of it in the Polynesian case. Putz proffered that he prepared the affidavit and sent it to Golden who signed it. The language of the affidavit conformed to that which was suggested by Putz's French Polynesian lawyer.

The defendants did not deny that the affidavit was signed by Michael Golden and sent to plaintiff in Orange, Virginia. However, in an effort to add context to the event, Michael Golden

5

testified that in mid-May, 2005 he received a call from Putz regarding the "ownership problem." Putz informed Golden that he, Putz, needed an affidavit to support the other evidence being presented to the Polynesian court. Putz indicated that he would send the papers being prepared by his lawyer along with a request that Golden execute the papers. Golden, then, was to return the signed document to Putz, which according to Golden, "I did."

On direct examination by his counsel, Golden testified that he had "no input" into the content of the affidavit. He read it, signed it before a notary and sent it to Putz solely for use in the court case because "he (Putz) directed me" to do so. Golden further testified he received no further consideration (payment) or any further promises from Putz in exchange for executing the affidavit. Golden admitted that he "wanted to help," and his action was intentional because he wanted to do what Putz, in Golden's words, "had directed" him to do.

On cross examination and upon questions by this court, Golden acknowledged a willingness to cooperate with Putz in signing an affidavit for presentation to the French Polynesian court. Golden confirmed that Putz had informed him of his need for the document, and Golden repeated his express desire to help Putz secure title. Golden further testified that he did not intend to set forth anything in the affidavit that was not true, inferring the affidavit contained a truthful statement of facts, and he acknowledged signing the document under oath before a notary public. Moreover, Golden confirmed that he mailed the affidavit to Putz in Virginia.

Golden also testified that he communicated with Putz in Virginia both by telephone and e-mails after the affidavit was sent and before this action was instituted in a "continuing effort on both [our] parts to get the transaction completed." Golden admitted that some of the telephone conversations were initiated by him while he was in Virginia.

6

At the continuation of the proceedings on June 23, 2009, the parties submitted a joint exhibit containing, *inter alia*, translated and French language orders and pleadings in the French Polynesian courts. (Joint Exhibit, June 23, 2009, Tabs 4-5A.[5]) To the extent the parties contend that the translated documents do not speak for themselves, they offer conflicting arguments as to their interpretation. However, without the need to interpret, a review of the four corners of the English versions thereof reveals: 1) The first court declined to entertain jurisdiction over the case filed by Panonia; 2) The first court dismissed the action without prejudicing any right to have the decision reviewed by a superior court; and 3) The first court taxed costs against Panonia and in favor of SCIP. (*Id.* at Tab 4.)

The parties agree that Panonia appealed, and on March 7, 2005, the reviewing court delivered a "judgment" which granted the appeal, concluded that the first court possessed jurisdiction over the subject matter, found the existence of a "serious dispute," declared (mandated) that "summary proceedings" be held, essentially remanding the case to the lower court for those proceedings, and essentially dismissed SCIP's claims by apportioning costs without assessing further damages. (*Id.* at Tab 4, Section II, Subsections 1-6.) The parties informed this court that, to date, no further proceedings have been held in the lower French Polynesian court.

**LEGAL STANDARDS**

The presiding District Court correctly acknowledged that a federal district court in Virginia may exercise personal jurisdiction over a non-resident defendant if the long-arm statute of Virginia authorizes assertion of jurisdiction and the long-arm statute is consistent with the Due Process

---

[5]Counsel for the parties agreed that Tab 5 of the Joint Exhibit represented what American courts would term a brief or memorandum by SCIP in opposition to Panonia's appeal and not an opinion or ruling by the court.

7

Clause of the Fourteenth Amendment. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945); *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273 (4th Cir. 2009). Here, Virginia's long-arm statute, V. C. A. § 8.01-328.1, provides that, "A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's . . . [t]ransacting *any* business in this Commonwealth." Va Code Ann. § 8.01-328.1(A)(1)(emphasis added).

Under *Consulting Engineers*, the court should consider the following factors in determining whether any business has been transacted in Virginia: 1) whether the defendant maintains an office or agents here; 2) whether the defendant owns property here; 3) whether the defendant reached into the state to solicit or initiate business; 4) whether the defendant deliberately engaged in significant or long-term business activities here; 5) whether the parties agreed that the law of this state governed the dispute; 6) whether defendant made any in-person contact with a resident here regarding the business relationship; 7) the nature and extent of the parties' communications concerning the business being transacted; and 8) whether performance of contractual duties was to occur within this state. 561 F.3d at 278; *see Peanut Corp. of Am. v. Hollywood Brands, Inc.*, 696 F.2d 311, 314 (4th Cir. 1982). As it relates to the eighth factor, namely the performance of the duties under the contract, it is clear that partial performance within the boundaries of the forum state may confer jurisdiction under the long-arm statute, even if that partial performance is not related to the claimed breach. *Production Group Intern., Inc. v. Goldman*, 337 F.Supp.2d 788, 794-95 (E.D. Va. 2004)(citing *Peninsula Cruise, Inc. v. New River Yacht Sales, Inc.*, 257 Va. 315 (1999)). The presiding District Judge already has concluded that, under *Peninsula Cruise*, acts of performance may give rise to jurisdiction over a claim for breach

8

of contract, even though such acts of performance are not specifically related to the alleged breach. It would seem to follow that acts of partial performance within the forum state need not be related to events constituting a breach even if those events occurred in another jurisdiction.

## PARTIES' CONTENTIONS

Plaintiffs contend that nothing proffered or introduced during the proceedings before this court has altered any of the facts material to the question of personal jurisdiction from those already found by the presiding District Judge. Putz believes that both his proffered evidence and the testimonial evidence offered by the Goldens shows that Mr. Golden knowingly and voluntarily executed an affidavit which reflected what he knew and believed to be true, and that he knowingly and willingly mailed the affidavit to Putz in Virginia for use by Putz in the Polynesian court to further his efforts to have the bungalow's titled transferred to him.

Moreover, plaintiffs contend that the presiding District Judge correctly stated and applied the controlling law under both Virginia's long-arm statute and the United States Constitution in concluding this court had personal jurisdiction over the defendants. Putz and Panonia believe that the decisional authorities confirm the long-arm statute reaches the limits of constitutional propriety by using the words "transacting any business" in Virginia, and that Golden's conduct constituted partial performance of the couple's obligations under the contract, as amended, irrespective of whether such conduct could not be considered part of the alleged breach.

Defendants, on the other hand, assert that the affidavit was for use by a foreign court, did not constitute a separate agreement, contained no new promises of future performance for any additional consideration, and recited essentially past performance, which defendants further suggest completed their obligations under the contract. They contend that the parties never

contracted for litigation assistance, the defendants are not parties to the foreign litigation, and there is no evidence about whether the affidavit actually was received or, if received, was used by Putz "in Virginia." Defendants contend that this case more closely parallels *Chung v. Nana Development Corp.*, 783 F.2d 1124 (4th Cir. 1986), than those cases relied on by the presiding District Judge, and that this action should be dismissed as the result of constitutionally insufficient minimum contacts with Virginia. In short, defendants contend that Michael Golden's conduct, even if considered transacting "any business" under the long-arm statute, was no more an isolated or attenuated event inadequate to satisfy the Due Process Clause of the United States Constitution.

Finally, defendants challenge whether the court can find that Michael Golden's actions can bind his wife.[6] They contest whether there is any evidence upon which the court can find that Michael Golden acted in any way other than in his individual capacity in executing and sending the affidavit.

In reply, plaintiffs caution the court against mixing substantive issues concerning the performance of the parties under agreement with conduct triggering the personal jurisdiction of the court. Plaintiffs contend that issues, like whether the contract has been fully performed or breached, are ultimate substantive questions about which the court must take the plaintiffs' pleadings as true rather than dispositively addressing them on their merits on a motion to dismiss for lack of personal jurisdiction. Furthermore, plaintiffs offer that the context of the transactions between the parties, as a whole, provides a basis upon which the court could infer and find that Michael Golden, when executing and mailing the affidavit to Putz in Virginia, acted both in his

---

[6] At the June 23, 2009 hearing, this court raised the issue of whether Golden was acting in his individual or joint capacity when he signed and returned the affidavit to Putz.

10

individual capacity and in a representative capacity for his wife relating to matters arising out of the agreement under which he and his wife had certain continuing obligations.

**FINDINGS AND CONCLUSIONS**

If one thing is clear after the evidentiary proceedings it is that none of the material jurisdictional facts found by the presiding District Judge have or should be changed. Whether the outcome of proceedings in the French Polynesian courts is as the presiding District Judge recited in his Opinion, or whether they demonstrate a slightly different status of the case pending there, is not material to whether the personal jurisdictional perquisites have been met. Even when the evidence is parsed to its ultimate, there is no question that Michael Golden, in an effort to assist Putz in the Polynesian litigation that had been filed to compel conveyance of title to the bungalow, knowingly, voluntarily and intentionally executed the affidavit and mailed it to Putz in Virginia. This court so finds.

Whether the agreement had been fully performed, as the Goldens now claim, or breached by the Goldens, as the plaintiffs claim, are substantive issues raised by the complaint, and the presiding court should resist the defendants' tempting offer to convert their current challenge to *in personam* jurisdiction into a motion dismiss for failure to state a claim or summary judgment on the merits of plaintiffs' claims. In other words, whether the Goldens have fully performed should not be addressed at this time on a personal jurisdictional motion, only whether there was conduct which the court could find constituted "transacting any business" in Virginia or otherwise subjected them to the jurisdiction of this court.[7]

---

[7] The District Judge found that because transfer of the property remains to be performed, the affidavit constituted partial performance. There not only is substantial evidence of that fact before the court, plaintiffs' well pleaded complaint to that effect must be construed in a light

11

Already, the presiding District Judge has observed the controlling authorities applicable to the now quite apparent undisputed facts. He has concluded that Michael Golden's conduct constituted partial performance which, though unrelated to any alleged breach, arose from or out of the parties' agreement. The District Judge specifically rejected the notion that such conduct was random, fortuitous or attenuated and concluded that what he found to be a single act of partial performance was sufficient, statutorily and constitutionally, to invoke personal jurisdiction over the Goldens. (Opinion at 8-9.)

In reaching this conclusion, the District Judge did not have the opportunity to assess the implications of *Chung*. Neither party chose to cite it until the defendants argued its application at the June 23, 2009 hearing before this court. Clearly the result in *Chung* is at odds with the initial result reached by the District Judge. A question remains, however, whether the premise upon which *Chung* was decided should apply here to compel the same result.

The facts in *Chung*, in part, parallel the facts in the case at bar. There, an Alaskan company sold frozen reindeer antlers to a Virginia resident who both initiated the purchase and intended to take complete delivery in Alaska. Unfortunately, when the buyer arrived in Alaska to take delivery, not all of the contracted quantity of 500 pounds was available from the initial reindeer harvest. Before the buyer left Alaska, however, it was agreed that the remaining frozen antlers would be shipped to the buyer in Virginia. They were so shipped, but, unfortunately had thawed and putrified during shipment. No insurance had been procured to cover the loss, and the Virginia plaintiff sued the Alaska company in a federal court in Virginia claiming that the defendant

---

favorable to them. Thus, anything the Goldens did to assist plaintiffs in securing the title, including execution and mailing the affidavit, would constitute partial performance.

12

breached a duty to the buyer to insure the shipment to Virginia.

The trial court apparently had little difficulty in concluding that the court had personal jurisdiction under Virginia's long-arm statutory provisions relating to contracting to supply services or things in Virginia. 783 F.2d 1124, 1127, n.2.[8] The Court of Appeals in a divided panel, however, concluded that the contact between the Alaska company and Virginia "was hardly so purposeful that litigation in Virginia could have been reasonably foreseen." *Id.* at 1127. The majority of the court observed that the defendant's contacts with Virginia virtually were "nonexistent," apart from the single transaction. *Id.* While a single transaction could provide a basis for the assertion of *in personam* jurisdiction, the court further observed that, by the shipment of goods into Virginia, the defendant did not place its goods sufficiently into the stream of commerce to permit Virginia to exercise jurisdiction consistent with Due Process.

There was a dissent in which Judge Ervin vigorously contended that the defendant purposefully did quite enough to have foreseen being hailed into Virginia courts. For many of the same reasons set forth by the District Judge here, the dissent believed that the putrified antlers did not arrive in Virginia because of the unilateral action of the Virginia resident but because of defendant's own conscious decision to alter its usual means of delivery and deliver the goods to plaintiff in Virginia. *Id.* at 1131-1132.

The undersigned's research of *Chung's* full history reveals it has been met with some criticism in other circuits, even when reviewing the lower courts who felt bound by *Chung* made a

---

[8]Prior to the appellate decision, the undersigned likewise would have little difficulty finding jurisdiction on the grounds that shipping goods, which were non-conforming at the time they arrived in Virginia, constituted both a breach of contract in Virginia and damage to the buyer in Virginia. Of course, that logic would not have fared any better before the *Chung* panel.

13

good faith effort to apply it. *See Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558 (Fed. Cir. 1994)(holding that *Chung* rested essentially on the purposeful contact requirements of due process under the circumstances of the case). In the main, *Chung* has been met with efforts, even within the lower courts of this circuit, to distinguish it, thereby limiting its application to its specific facts, and essentially suggesting that the shipment of the antlers to Virginia merely was for the convenience of the Virginia plaintiff. *See Orangeburg Pecan Co., Inc. v. Farmers Inv. Co.*, 869 F.Supp. 351, 358 (D.S.C. 1994); *Frontline Test Equipment, Inc. v. Greenleaf Software, Inc.*, 10 F.Supp.2d 583, 589 (W.D.Va. 1998); *Investment Group LC v. Lichtenstein*, 441 F.Supp.2d 3,10 n.4 (D.D.C. 2006).

Whether one thinks *Chung* rightly or wrongly decided,[9] the case remains woven into the fabric of the law in this circuit and a case with which we must reckon under the circumstances presented here. Like other courts which have distinguished it, the undersigned believes that, while factually close to this case, it is sufficiently distinguishable such that its outcome does not control the one here. Notwithstanding the Goldens' argument to the contrary, the great weight of the evidence demonstrates that the parties agreement "to buy" and "to sell . . . the property known as Bungalow number twelve(12)" has not be consummated, despite intentions and efforts to do so. Moreover, the Goldens' duty to "arrange that the Board of Directors *will* approve the transfer of stocks..." has yet to be fulfilled. The great weight of the evidence also demonstrates that both Goldens had duties to perform under the agreement, and that Michael Golden had expressed an intention and took steps to act on that intention to do what was necessary to effectuate full performance on both their parts. This included Michael Golden's response to Putz's request to

---

[9] After all, it is the duty of this court to apply the law of the circuit.

assist in the French Polynesian court proceeding by executing an affidavit and returning it to him in Virginia. The presiding District Judge found such action constituted partial performance on a yet-to-be fully performed contract, in which the undersigned concurs.

Accordingly, the undersigned finds no reason on the preponderance of the evidence, or in the law of this circuit, for the presiding District Judge to adjudicate the motion to dismiss differently. Defendants' motion to dismiss, again, should be denied. It is so RECOMMENDED.

The Clerk is directed to immediately transmit the record in this case to Honorable Norman K. Moon. Both sides are reminded that pursuant to Rule 72(b) they are entitled to note objections, if any they may have, to this Report and Recommendation within (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

The Clerk is directed to send a certified copy of this Report and Recommendation to all counsel of record.

ENTERED: /s/ _____
U. S. Magistrate Judge

7-2-2009
Date

15

Case 3:09-cv-00003-NKM-BWC   Document 29   Filed 07/02/09   Page 15 of 15   Pageid#: 187