```
 1                 UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF VIRGINIA
 2                    Charlottesville Division

 3

 4   DR. HERBERT R. PUTZ,           Civil No. 3:09cv00003
     Et al.,
 5
                 Plaintiffs,
 6
                 vs.                Charlottesville, Virginia
 7
     MICHAEL H. GOLDEN and
 8   SUZANNE C. GOLDEN,

 9                 Defendants.   May 28, 2009

10

11               TRANSCRIPT OF EVIDENTIARY HEARING
           BEFORE THE HONORABLE B. WAUGH CRIGLER,
             UNITED STATES MAGISTRATE JUDGE
12

13   APPEARANCES:

14   For the Plaintiff:
                                Michie Hamlett Lowry
15                              Rasmussen & Tweel
                                EDWARD B. LOWRY, ESQ.
16                              P.O. Box 298
                                Charlottesville,VA
17                              22902-0298

18
     For the Defendant:
19                              Richmond & Fishburne
                                HOWARD H. HOEGE, III, ESQ.
20                              214 E. High St.
                                Charlottesville,VA 22902
21
     Court Reporter:            Sonia R. Ferris, RPR
22                              U.S. Court Reporter
                                255 W. Main St. Room 304
23                              Charlottesville, VA 22902
                                434-296-9284
24

25   Proceedings recorded by mechanical stenography;
     transcript produced by computer.
```

1          THE COURT:  Let the record reflect that this

2   is 3:09cv34, Herbert R. Putz, et al., versus Michael H.

3   Golden.

4          This matter is before the Court on a

5   reference order by Judge Moon who initially entered a

6   memorandum opinion and order sustaining the exercise of

7   personal jurisdiction over the defendants in this case

8   and then I guess he sort of vacated the order and sent

9   the matter to me for purposes of conducting an

10  evidentiary proceeding at which the plaintiff would have

11  the burden of showing by a preponderance of the evidence

12  that there is jurisdiction.

13          Are you prepared to proceed?

14          MR. LOWRY:  Yes, sir, we are.

15          THE COURT:  Are the defendants prepared to

16  proceed?

17          MR. HOEGE:  Yes, Your Honor.

18          THE COURT:  Do y'all want the rule on the

19  witnesses or is that necessary?

20          MR. LOWRY:  Not necessary, as far as I'm

21  concerned.

22          MR. HOEGE:  We would like it, Your Honor.

23          THE COURT:  Is anybody but a party going to

24  testify?

25          MR. LOWRY:  The only witnesses I'm aware of

1    are Dr. Putz and Mr. Golden.

2              THE COURT:  Are there any other people here

3    to be witnesses in the case or are y'all just observers?

4              MR. HOEGE:  Not on our side, Your Honor.

5              THE COURT:  One of the things that has

6    occurred in the interim is there has been some

7    supplemental briefing that took place -- when I say

8    supplemental, there was a decision that was tendered to

9    the Court from the Fourth Circuit, an '09 decision, that

10   was written by Judge Duncan.  She laid out all of the

11   factors that essentially are important for the Court's

12   consideration unless you don't think those factors are

13   applicable.  I thought it would be a good framework to

14   go by, at least for analysis purposes, but I'll let the

15   plaintiff present whatever evidence they want.

16             There's bound to be stuff here that's not in

17   dispute and the only question is whether there's

18   something that is in dispute that people need to be

19   heard on.

20             MR. LOWRY:  Right.

21             I'm not aware of the Court having received

22   that case, so I'm not exactly sure what case it is.

23             THE COURT:  I'll tell you what case it is.

24   It's Consulting Engineers Corporation v. Geometric

25   Limited.  It was decided March 23, 2009.  It was sent to

1    me in sort of a fast case format.  I didn't even go back

2    to check whether it's actually published.

3           MR. HOEGE:  Your Honor, I think that's an

4    exhibit to the plaintiff's response.

5           MR. LOWRY:  We're familiar with the case. I

6    thought this was something since our response.

7           THE COURT:  No.  It was just an informative

8    case.  The facts are a little different here than there,

9    but the outline of the legal principles and the analysis

10   seem to be very helpful.

11          MR. LOWRY:  I agree.

12          I think in his discussion in the law and the

13   memorandum opinion, which has now been vacated, Judge

14   Moon kind of tracked those same points, in his analysis.

15          THE COURT:  He did.

16          As I see, the only issue here is whether the

17   defendant deliberately engaged in significant or long-

18   term business activities or whether there was contact

19   with the resident forum regarding the business

20   relationship.  It seems to boil down for Judge Moon to

21   the question of the affidavit.

22          MR. LOWRY:  Right.

23          THE COURT:  He found that that was partial

24   performance, but nothing was raised concerning the

25   alleged tortious conduct.

1          MR. LOWRY:  I'm prepared to offer through

2     Dr. Putz's testimony about the entire lengths of the

3     relationship and everything that happened, but if I

4     could, I'd like to make a proffer up to a certain point

5     where I know we have a dispute.  If there's something

6     objectionable to the proffer, I'll go forward and

7     present the evidence on the whole nine yards.

8          THE COURT:  Let's hear the proffer. If

9     counsel has an objection to it, we can deal with it on

10    that basis.

11          Is that satisfactory?

12          MR. LOWRY:  Certainly.

13          MR. HOEGE:  Yes, Your Honor.  Thank you.

14          MR. LOWRY:  I know Your Honor has read the

15    pleadings.  I'll kind of hurry up --

16          THE COURT:  Don't hurry.  This is a case

17    where Judge Moon felt as though there needed to be an

18    evidentiary proceeding and far be it from me to cut it

19    short.  I'm just trying to hone down on the real factual

20    issues that are in contention. That's all.

21          MR. LOWRY:  I think what Judge Moon said in

22    his vacation order was that he hadn't realized at the

23    time he wrote his opinion that there had been a request

24    for an evidentiary hearing and so he felt like he had

25    gotten out ahead of the process by issuing the opinion

1  and was taking us back to square one.

2           THE COURT:  He pushed the restart button.

3           MR. LOWRY:  Right, pushed the restart

4  button.

5           Well, essentially, the way we got here is

6  that Dr. Putz was in Bora Bora, French Polynesia, I'll

7  just say as a broad term to cover all of this.  He saw

8  these very nice vacation type bungalows.  Was interested

9  in purchasing one.  He made inquiries there and was

10 given the name of Mr. Golden as someone who owned a

11 bungalow and was interested in selling his interest and

12 they gave him contact information to reach the Goldens.

13 He then initially called and over the course of time,

14 had contacts with Mr. Golden by telephone, eventually

15 letter and e-mail.

16          THE COURT:  But during those periods of

17 time, nobody was in Virginia.

18          MR. LOWRY:  That's correct -- well, Dr. Putz

19 owned a farm in Virginia, but he was living in New York.

20 All these early contacts were in New York.  I'll kind of

21 signal when we get up to the first Virginia contact.

22          Made the contact.  They went through the

23 negotiating process.  Goldens were interested in

24 selling.  Dr. Putz was interested in buying. They

25 entered into a contract.  Still all happening between

1   Washington State and New York, whereby Dr. Putz

2   eventually would be the purchaser of these -- of this

3   bungalow.

4            The way it's set up, which is very unusual

5   in this entity in French Polynesia is that you buy

6   certificates or stock that represents the bungalow that

7   you're getting.  Eventually, you can have those

8   converted into a deed; their equivalent of a deed and

9   take title directly to the bungalow.

10            In setting up this transaction, Dr. Putz --

11            THE COURT:  Is there a physical certificate

12   that gets transferred?

13            MR. LOWRY:  Yes.

14            THE COURT:  Any debate over that?

15            MR. HOEGE:  Yes, Your Honor.

16            I've never seen a certificate.  I've always

17   heard this called a share, shares in the corporation.

18            THE COURT:  Then we'll have to have

19   evidence.

20            MR. LOWRY:  We can, but I don't think

21   there's any dispute that there was to be a transfer of

22   the shares.

23            Are we agreed on that?

24            MR. HOEGE:  That's correct, Your Honor, and

25   as far as this portion of the proffer, I don't believe

1   that the plaintiffs are asserting that anything to do

2   with the 1987 negotiations would establish personal

3   jurisdiction in any way.

4          MR. LOWRY:  That's correct, that's correct.

5   This is just background.

6          THE COURT:  I don't have a problem with that

7   because of the way I see it, but when time came to

8   deliver the shares, they weren't delivered and the

9   question becomes where are they deliverable to.

10         MR. LOWRY:  I don't think that's a problem.

11  I'll get into that in a second.

12         I don't think anybody disagrees there was to

13  be a transfer of the shares. Dr. Putz had been advised

14  by an attorney in French Polynesia that the best way to

15  do it is to set up an American corporation, have the

16  shares transferred into that.  For some reason, he felt

17  it would be easier.  So Panonia Realty, a corporation,

18  was created.  The initial stockholders were made to be

19  the Goldens.  The shares, by contract or by the

20  documentary transaction, were transferred into Panonia.

21  Then the shares in Panonia were transferred by the

22  Goldens to Dr. Putz.

23         Everything went along fine for a long period

24  of time.  Dr. Putz discharged all his obligations.

25         THE COURT:  So everybody thought that would

1    accomplish what needed to be accomplished.

2          MR. LOWRY:  Everybody thought it was done at

3    that point in time, I believe.

4          THE COURT:  That's the proffer.

5          MR. HOEGE:  All right.  Should I say my

6    objection?

7          THE COURT:  I think --

8          MR. HOEGE:  Again, the dispute that we would

9    have on this point, Your Honor, would be that the extent

10   to which the Goldens were made shareholders of Panonia.

11   Absolutely do not dispute that Panonia was established,

12   that shares of the SCIP were to be transferred to

13   Panonia Realty pursuant to the underlying contract.

14   Whether or not the Goldens were made shareholders is a

15   matter in dispute.

16         MR. LOWRY:  Again, I would submit, although

17   we think it will be clear that they were, that even if

18   they weren't, it's irrelevant to today's proceedings

19   because the question is when and if they had contact

20   relating to this transaction with Virginia.  That's what

21   I'm creeping up on at this point.

22         Obviously, I think both sides will agree,

23   and again, correct me if I'm wrong, that everybody

24   thought what needed to be done had been done, whatever

25   that is, to transfer the Goldens' interest to Dr. Putz.

1  Dr. Putz paid the purchase price. He went on for

2  18 years paying the annual maintenance fee and other

3  fees, taking care of it.  Actually even served as

4  president of the board of directors of -- everybody is

5  calling it SCIP.  That's the acronym for the bungalow

6  group.  Everything went along fine until he tried, and I

7  believe it was in 2005, to get the bungalows actually

8  titled to him in exchange for the certificates.  At that

9  point, SCIP balked and said no that the transfer --

10             THE COURT:  Does SCIP sound for something?

11             MR. LOWRY:  I'm sorry.  It's in the

12  pleadings.  It's a long French name.

13             THE COURT:  Is the acronym, SCIP?

14             MR. LOWRY:  Yes, sir. That's basically the

15  homeowner's association.

16             DR. PUTZ: Your Honor, it's Societe Civile

17  Immobiliere Paepaepupure.

18             THE COURT:  I'm a redneck, so I can't speak

19  French.  SCIP is fine for me.

20             MR. LOWRY:  That may be my misstatement.

21             At any rate, they balked and said they

22  wouldn't do it. Dr. Putz brought an action in court in

23  French Polynesia to force them to transfer title to him.

24  At the trial level, they won.  He then turns around and

25  contacts Dr. Golden and tells him what's going on and

1   they discuss it.  This is where I think we probably have

2   some disagreement, but I'm not even sure of that. Dr.

3   Putz' testimony --

4          THE COURT:  Looks like people are in and out

5   between the sheets a lot in this case.  Sometimes

6   they're in bed with each other and sometimes they're at

7   odds with each other because they're trying to get the

8   job done.

9          MR. LOWRY:  Could be.  But at this point,

10   they discuss what can be done about it and they

11   discussed Mr. Golden providing an affidavit to say,

12   look, I intended to transfer ownership to Dr. Putz and

13   this is how it was done.  So an affidavit was prepared.

14   Dr. Putz' testimony will be it was prepared after joint

15   conversation about it's contents.  I don't know what Dr.

16   Golden will say.

17          At any rate, our testimony will be that the

18   affidavit was prepared.  It was sent to Dr. Golden, who

19   signed it, sent it back to Dr. Putz, in Virginia, and

20   that the conversations leading up to the affidavit were

21   by Dr. Putz in Virginia, Dr. Golden in Washington.

22          The affidavit was sent to Virginia.  Dr.

23   Golden used that in an attempt to persuade the appellate

24   Court to overturn the trial court, unsuccessfully.

25   Ultimately, they said the certificates had not been

1    properly --

2              THE COURT:  The appellate court reversed the

3    trial court.

4              MR. LOWRY:  No, they sustained the trial

5    court in saying the shares had not been properly

6    transferred.

7              So at this point, Dr. Putz is out.  The

8    record owners of the shares are still the Goldens.  So

9    he's at the point that brings us here today.  He wants

10   either his bungalow or his money back that he paid for

11   the bungalow and that's what brings us up to today.

12             Under our theory of the case, as you've seen

13   in the pleadings, number one, that contact of sending,

14   which was part of contract performance, sending the

15   affidavit to Virginia, is sufficient under Virginia's

16   long arm statute to establish jurisdiction and satisfies

17   --

18             THE COURT:  That's what Judge Moon found.

19             MR. LOWRY:  Right.  And that satisfies the

20   requirements of due process. But there's more than just

21   that and Judge Moon found this as well.  If our theory

22   of the case is right, then there's still an obligation

23   on the parts of the Goldens to transfer that property or

24   pay the money back and that that performance of the

25   contract will, of necessity, have to take place at least

1   partially in Virginia.

2           So those are the two basis where we find

3   sufficient contact under Virginia law and the due

4   process clause to establish jurisdiction and those are

5   the two basis on which Judge Moon ruled that there was

6   jurisdiction in this matter.

7           How much of that I'm going to need to put on

8   by way of evidence, I'll leave up to Mr. Hoege and I'm

9   happy to put it all on or just whatever portion he feels

10  is really contested.

11          THE COURT:  Other than what you've already

12  said about the degree to which the Goldens were made

13  shareholders, is there any disagreement with the

14  representation and proffer of facts?

15          MR. HOEGE:  It's --

16          THE COURT:  It's not a trick question. I'm

17  not trying to trick anybody.  If there isn't, we may go

18  one way and if there is, we may have to go another.

19          MR. HOEGE:  Forgive me.  I may give you a

20  little more information than you're asking for.

21          I would also add that with respect to the

22  1987 negotiations, there was the question of whether or

23  not we were talking about stock certificates or shares.

24  I think both sides agree that that doesn't impact --

25  ultimately, something had to be transferred.  We would

1    say you would refer to them as shares.

2              MR. LOWRY:  That's fine.

3              THE COURT:  Let me just put it -- there was

4    a physical item that represented the intangible interest

5    in the corporation; is that correct?

6              MR. HOEGE:  We don't know that, Your Honor.

7              THE COURT:  I mean, if you become a

8    shareholder, you've got an intangible interest that's

9    represented by a tangible piece of paper, right?  And if

10   you transfer that, that's the indicia of ownership and

11   you don't need to record it because that's the ownership

12   as opposed to a title to real estate which you need to

13   record and you don't have to have that. You can hold it

14   without ever recording it.

15             MR. LOWRY:  Sometimes it's just the

16   agreement itself that transfers it's interest without a

17   piece of paper.

18             THE COURT:  Right.

19             So irrespective of all of that -- here's

20   where I'm coming from and help me if you can.

21             This is one of those cases where nobody

22   seems to be falling out over what the agreement was.

23   The problem is that between the date that the agreement

24   was struck and the time performance is to occur, which

25   it hasn't occurred yet, the potential is, and that's the

1   issue here, the potential for the place of performance

2   changes -- is that a fair statement -- from one place

3   with it's consequences back in French Polynesia, to

4   another place, with it's consequences back in French

5   Polynesia.  To me, that seems to be the issue here.

6           MR. HOEGE:  I think it's close to the issue.

7           THE COURT:  I don't want to get close.  I

8   want the issue.

9           MR. HOEGE:  Your Honor, really, I think it

10  is ultimately important to the question of personal

11  jurisdiction because our position is that the

12  performance did occur and in fact, all the documents

13  suggest that the performance did occur.

14          THE COURT:  My question to you men this

15  morning was going to be, Judge Moon found partial

16  performance in Virginia.  The facts will either support

17  or dispel that. If they support it, his decision stands

18  and all I would say is, Your Honor, your decision

19  stands.  Readopt it. If it doesn't support that, I would

20  say the facts don't support that and your decision can't

21  stand.

22          Then we have the other issue, which I'm sure

23  he wants me to resolve, too, is whether there's been an

24  alleged tort committed because you do assert a tort

25  claim in your pleading, right?

1          MR. LOWRY:  We do.  I don't know that

2     there's a 12(b)(6) on that at this point.

3          THE COURT:  No, but the problem is, if you

4     commit a tort anywhere that has consequences in

5     Virginia, you're on the hook.  So if you have

6     jurisdiction over the tort, don't you have jurisdiction

7     over the whole set of transactions that are interrelated

8     to the tort, whether they're in contract or not?  At

9     least, that's what my conflicts professor told me.

10          MR. HOEGE:  Your Honor, I think the question

11     of stock certificates and delivering a piece of paper or

12     not is important and the question of performance or not

13     is important.

14          THE COURT:  We'll have to hear the evidence

15     about that.

16          Is that what you came prepared to deal with?

17          MR. LOWRY:  We are, although I'd like to

18     hear what the theory is about why they're important.

19          THE COURT:  I don't care what the theories

20     are.  If they don't have countervailing evidence, you

21     win.

22          MR. LOWRY:  The ultimate question of whether

23     or not they have fully performed is a trial question.

24     It's not a jurisdictional hearing question.

25          THE COURT:  No question.

1          Full performance is not the issue here.

2     It's whether or not there's any performance in Virginia

3     because under the long arm statute and under

4     constitutional principles of minimum sufficient

5     contacts, they both would fall and give jurisdiction to

6     the Court.  That's why my question was, is Judge Moon's

7     determination of partial performance right or wrong

8     based on the preponderance of the evidence at an

9     evidentiary hearing.

10          MR. LOWRY:  I would submit that the issue of

11     partial performance, as opposed to full performance, has

12     to be judged at this stage of the case on our pleadings,

13     that we have pled it was only partial, rather than your

14     having to determine was it partial performance back in

15     '87 or completed performance back in '87.

16          THE COURT:  I'm ready to deal with that,

17     legal issue, too.  I don't think it matters.  The

18     contract is not complete because the deed hasn't been

19     delivered.

20          MR. LOWRY:  That's our position.

21          MR. HOEGE:  That's their position, Your

22     Honor. So far, there's --

23          THE COURT:  There hasn't been sufficient

24     performance to the extent that plaintiff claims there's

25     been a breach of the contract.  Or in the alternative,

1    there's been -- or you're actually demanding it.  This

2    is an injunction proceeding, isn't it? You're demanding

3    a declaration to proceed to transfer a title, right?

4                MR. HOEGE:  No.

5                THE COURT:  What are you asking?

6                MR. HOEGE: Your Honor, we're here on our

7    motion.

8                THE COURT:  I mean, the plaintiff is asking

9    that the -- that something be done to actually transfer

10   title or get their money back.

11               MR. LOWRY:  That's correct.

12               THE COURT:  Recision or performance.

13               MR. LOWRY:  That's correct.

14               THE COURT:  It's an old fashioned property

15   case.

16               MR. LOWRY:  That's right.  It's as basic as

17   you get.

18               THE COURT:  That's the only way I can

19   resolve it.

20               MR. HOEGE:  Your Honor, our request to you

21   would be to retain an open mind about whether or not

22   performance has been performed -- whether or not

23   performance has occurred or not because --

24               THE COURT:  That's exactly what I came in

25   here to do because I have no qualms. I've been called on

1  several times to reverse a district judge by below by

2  making findings. He sent it to me to determine whether

3  he was right or wrong.

4           MR. LOWRY:  Could I just ask one other

5  question of Mr. Hoege?

6           Is there an issue as to whether or not the

7  affidavit was signed by Mr. Golden and sent to Virginia?

8           THE COURT:  Is there a question of fact over

9  whether it was signed by Mr. Golden and sent to

10  Virginia?

11           MR. HOEGE:  There is no question of fact as

12  to that.

13           THE COURT:  That it did occur.

14           MR. HOEGE:  That it did occur.

15           The questions of fact surrounding the

16  formation of the affidavit though are in dispute, Your

17  Honor.

18           THE COURT:  That's fine.

19           MR. LOWRY:  In that case, based upon the

20  proffer and the response to the proffer, Your Honor has,

21  I believe, the affidavit.  It's an exhibit to the

22  complaint.

23           THE COURT:  Let's see if I've got it.

24           MR. LOWRY:  I don't believe the Court can

25  take parole evidence on whether or not the contents of

1  the affidavit is accurate if it's not vague.  Four

2  corners rule in Virginia takes care of that.

3              THE COURT:  Parole evidence rule.

4              MR. LOWRY:  That's correct, parole evidence

5  rule.

6              I would submit that on it's face, the

7  affidavit, which has been admitted to have been sent to

8  Virginia and signed by Dr. Golden, states the predicate

9  facts.

10             MR. HOEGE:  Your Honor, we have --

11             THE COURT:  I feel like we're in a Laurel

12 and Hardy moment.  This is a fine mess everybody has put

13 us in.

14             MR. HOEGE:  We have a 106 objection to the

15 affidavit and we would just ask that the affidavit be

16 made complete.  So the affidavit references by

17 incorporation paragraph four, a letter dated April 16,

18 1987.

19             THE COURT:  106, Federal Rule of Evidence?

20             MR. HOEGE:  Yes, Federal Rule of Evidence,

21 106.

22             THE COURT:  I haven't had an objection on

23 that ground in so long, I've got to go look it up.

24             Honestly, is that --

25             MR. HOEGE:  106 is the remainder of or

1  related writings of recorded statements. The rule

2  states, Your Honor --

3              THE COURT:  You mean the completion rule?

4              MR. HOEGE:  That's correct, Your Honor.

5  Sorry.

6              THE COURT:  The rule says if they offer part

7  of it, you get to offer something else to complete it.

8  So they've offered the whole affidavit.

9              MR. HOEGE:  Okay.

10             THE COURT:  The affidavit does speak for

11  itself because there's no dispute that it was signed and

12  sent.

13             MR. HOEGE:  And Your Honor, paragraph four

14  of the affidavit, references an annex and that annex is

15  not included.

16             THE COURT:  Maybe your opponent over here

17  won't have a problem with that either if that's the

18  European term for attachment.

19             Mr. Lowry, is there any objection to the

20  Court considering the attachment in paragraph four that

21  says it's annexed, #2?

22             MR. LOWRY:  I'm just looking at the

23  affidavit.  #4 in mine says in accordance with the terms

24  of the sales contract, I notify --

25             THE COURT:  Look at the parentheses at the

1    end.

2                    MR. LOWRY:  Oh, I see.

3                    No, I have no objection to that being -- but

4    I'd like to see what they're proffering, but I don't

5    think we'll have a problem with it.

6                    THE COURT:  Show it to him.

7                    MR. HOEGE:  If you'll give me a moment, Your

8    Honor.

9                    THE COURT:  I will.

10                   If that was part of the document, his whole

11   document argument needs to account for the whole

12   document.

13                   Nobody is going to be able to figure out

14   this record we've created here this morning.

15                   (Said document shown to counsel).

16                   MR. LOWRY:  I don't have any problem with

17   it.

18                   THE COURT:  Do you want to have the Court

19   receive that as a Defendant's Exhibit at the hearing,

20   which will be considered as part of the affidavit which

21   was filed with the complaint, which is Plaintiff's

22   Exhibit B to the complaint, which I take judicial notice

23   of because it's already been filed?

24                   MR. HOEGE:  Yes, Your Honor.

25                   THE COURT:  Is that agreed?

1          MR. HOEGE:  That's agreed.

2          THE COURT:  The complaint has been filed.

3   Along with the complaint was the affidavit.  I take

4   judicial notice of the complaint and the affidavit,

5   along with your statement that there's no question that

6   the affidavit was signed by Mr. Golden -- Dr. Golden --

7   and sent to Virginia.

8          MR. HOEGE:  That's correct, Your Honor.

9          THE COURT:  Cool.

10         So we'll receive this as Defendant's Exhibit

11  1 for hearing purposes.

12         (Defendant Exhibit #1 was marked for

13  identification and admitted into evidence).

14         MR. LOWRY:  Then I would renew my motion

15  that on it's face, the affidavit, which has been

16  admitted --

17         THE COURT:  -- constitutes partial

18  performance.

19         MR. LOWRY:  That's correct.

20         THE COURT:  We're still at the proffer

21  stage.  What we've gotten is a proffer.  We had an

22  objection to a part of a proffer.  Then we had a counter

23  proffer, which was this attachment or annex to the

24  affidavit, which the Court received, and essentially, a

25  stipulation that there's no debate or dispute over

1  whether the affidavit was signed by Dr. Golden and sent

2  to Virginia, to Dr. Putz, in Virginia.

3        MR. LOWRY:  That's correct, yes, sir.

4        Basically, what we're moving the Court on is

5  the affidavit, the Defendant's Exhibit 1, and the

6  contract, which is also a part of the pleadings that we

7  ask you to take judicial notice of, all reflect, number

8  one, partial performance occurring in Virginia and on

9  the basis of our complaint as to when it occurred,

10 performance yet to occur that has to occur in Virginia.

11       THE COURT:  This is a defining moment.  Here

12 we are. The only question I have is, does the plaintiff

13 wish to present additional evidence to that which the

14 Court can take either judicial notice of for purposes of

15 these proceedings, that is, the attachments to the

16 complaint, or has been agreed to exist by the defendant?

17       MR. LOWRY:  One second.

18       (Mr. Lowry conferred.)

19       THE COURT:  Then it puts the burden on you

20 to provide evidence.

21       MR. HOEGE:  I understand that, Your Honor.

22 Then I'd --

23       THE COURT:  Then I'd give you a chance to

24 make whatever proffer and presentation you wish.

25       MR. HOEGE: Your Honor, I guess when they're

1  done, if I might speak for one moment.

2          MR. LOWRY:  Yes, we have no further evidence

3  to put on at this point.

4          MR. HOEGE:  Your Honor, what I'm not --

5          THE COURT:  This is a great case. I'm sorry.

6  I'm having a good time.

7          MR. LOWRY:  I can tell.

8          THE COURT:  It's a mess, but it needs to get

9  straightened out.

10          MR. HOEGE:  Your Honor, what I'm not clear

11  on is I'm hearing two different things and I want to be

12  sure I understand what you intend.

13          THE COURT:  Here's what's happened.  Can I

14  tell you what's happened and you can ask me to explain.

15          What's happened is there's really no dispute

16  over the facts that plaintiff came here to present.

17  That is to say, the background information, there's no

18  despite that historically, there was no connection with

19  Virginia; that this was a contract that was entered into

20  by parties who had no contact with Virginia for the sale

21  of a piece of property in French Polynesia.  But because

22  of the delay and the vicissitudes of fulfilling the

23  contract, there was an event that took place that caused

24  the preparation of an affidavit, which is stipulated to

25  in it's entirety, including the annex from paragraph

1 four, by your client, the defendant, one of the

2 defendants, and sent to Virginia in furtherance of doing

3 under the contract what the parties intended to do under

4 the contract, upon which, without a hearing, Judge Moon

5 found to be partial performance.

6         The plaintiff says they don't have anymore

7 evidence.  They're resting on that evidence.  But if you

8 have countervailing evidence, it's my obligation and

9 desire to give you the opportunity to present any

10 evidence that you think because if this is the evidence,

11 I'm going to tell you, Judge Moon was right.  If it's

12 not the evidence, which I have an open mind to as to

13 whether it is or not, then he may be right and he may

14 not be right.  I have to determine.  I don't mean in the

15 law, I mean in the facts.

16         MR. HOEGE:  Your Honor, there is a -- I

17 think there are --

18         THE COURT:  Nobody's trying to hoo-do

19 anybody else. This is not a "gotcha" kind of thing.

20         MR. HOEGE:  Absolutely, Your Honor.

21         What I am having -- what the defendants are

22 having a problem with is the conclusion that the

23 affidavit equals partial performance of the contract.

24 There is no dispute that an affidavit was sent to

25 Virginia.  How that affidavit was formed and the nature

1  of that affidavit is in dispute.

2          THE COURT:  It may not be, but you want to

3  present evidence about it.

4          MR. HOEGE:  We dispute the characterization

5  that that is partial performance of the contract.

6          THE COURT:  That's a legal conclusion that

7  Judge Moon made. If you say there's law that suggests

8  that his conclusion of law based on the facts is

9  erroneous, I've got an open mind about that, too,

10  because he's going to want to hear about it.

11          MR. HOEGE:  That's our position.

12          THE COURT:  I completely understand.  It was

13  the second question that I was going to have today

14  because the first one was, is there any dispute that

15  this affidavit -- what is the beef here -- and there

16  isn't one on the evidence.  It really is about the

17  conclusion he drew about the evidence.

18          MR. HOEGE:  That's correct, in terms of

19  characterizing the affidavit as partial performance.  We

20  agree with that.

21          We would like the opportunity to present

22  additional evidence --

23          THE COURT:  Concerning how the affidavit

24  came to be?

25          MR. HOEGE:  Yes, Your Honor.

1          THE COURT:  Do you have an objection to

2     that?

3          MR. LOWRY:  Only if there's an allegation

4     that it was procured by fraud or mutual mistake of fact

5     or there's a finding that it's vague.

6          THE COURT:  Here's what I'm going to do. I'm

7     going to reserve a ruling on that objection based on

8     those reasons. I'm going to let him present the

9     evidence.  Then I'm going to make a determination of how

10    relevant it is or isn't to the decision of jurisdiction.

11         How's that? We're here to create a record.

12    I don't want to have to restart these proceedings.

13         MR. HOEGE:  Yes, Your Honor.

14         THE COURT:  Who do you want to call?

15         Plaintiff rests.

16         Why don't we take a recess and I'll let you

17    think about it?

18         MR. HOEGE:  Thank you, Your Honor.

19         THE COURT:  A lot of things have happened

20    here.  There are procedural things going on, substantive

21    things going on.  But I just want both sides to

22    understand, I think the key here is, first of all, is

23    whether the affidavit was executed and sent.  That's my

24    humble view.

25         Secondly, whether that does constitute, if

1  there's authority out there to the contrary, whether

2  that does constitute partial performance under the

3  circumstances of this case, 99.44 percent of which are

4  not in dispute because the annex really confirms most,

5  if not all, of Mr. Lowry's proffer about the background

6  that's relevant.

7          Again, I've got an open mind on all of that.

8  I'm not trying to squeeze somebody into a particular

9  route.

10          MR. HOEGE:  Thank you, Your Honor.

11          THE COURT:  Think about it.

12          Hopefully, if you've got a case that says

13  that's not partial performance, I want to hear about it.

14  But I'll hear you anyway.

15          THE COURT:  We're in recess.

16          (Recess at 10:30 a.m. until 2:15 p.m.)

17          We're back on the record after taking some

18  time for the parties to confer over some things.

19          I want to ask the defendants if they have

20  any evidence to present.

21          MR. HOEGE:  Your Honor, first, I think that

22  we may have misunderstood some of the proffer earlier.

23  So I'd just like, if it's fine by the Court, to hear Mr.

24  Lowry's characterization of how the affidavit was

25  formed.

1          THE COURT:  He didn't.  He just said it was

2   formed, it was signed, it was submitted and you wanted

3   to complete the document with the attachment or what was

4   called the annex.

5          MR. LOWRY:  What I either said or intended

6   to say was there was a telephone conversation between

7   Dr. Putz and Dr. Golden in which an affidavit was

8   discussed.  Dr. Putz prepared a document, sent it to Dr.

9   Golden, who signed it and sent it back to Orange.

10          Is that accurate?

11          (Mr. Lowry conferred with his client).

12          MR. HOEGE:  I'm sorry.  Was the proffer that

13  Dr. Putz suggested the affidavit?

14          (Mr. Lowry conferred with his client).

15          THE COURT:  His evidence would be it was

16  mutual.

17          MR. LOWRY:  The lawyer in Paepaepupure, who

18  was the lawyer, for the transaction --

19          THE COURT: Spell that for the Court

20  Reporter.

21          COURT REPORTER: I have it, Your Honor.

22          MR. LOWRY: It's P-a-e-p-a-e-p-u-p-u-r-e.

23          He suggested to Dr. Putz that there be an

24  affidavit.  Dr. Putz passed that along to Dr. Golden in

25  their conversation.  They discussed the content.  They

1  discussed whether or not an affidavit would be given.

2  Dr. Putz drafted it, sent it to Dr. Golden, who signed

3  it and sent it back.

4          THE COURT:  That's the proffer.

5          Mr. Lowry's position has been unless there

6  is some alleged fraud or overbearing or anything else,

7  how it was put together is not relevant.

8          MR. HOEGE:  That's right.

9          THE COURT:  Because it was signed.

10         MR. HOEGE:  Yes, Your Honor.

11         I believe that that last piece is a

12  characterization or statement of law or a conclusion of

13  law.  Our position regarding the formation of the

14  affidavit is that in terms of trying to determine

15  minimum contacts, it is important to determine who

16  initiated, who drafted, et cetera, because of Fourth

17  Circuit precedent that would say that the unilateral --

18         THE COURT:  So you disagree with the

19  characterization of the evidence?

20         MR. HOEGE:  Absolutely, Your Honor.

21         THE COURT:  Put on your evidence.

22         MR. HOEGE:  Your Honor, defense would call

23  Mr. Golden.

24   MICHAEL GOLDEN, CALLED AS A WITNESS THE DEFENSE, SWORN

25         THE COURT:  Have a seat.  State your name

1    and then respond to all questions verbally.

2                 THE WITNESS:  Michael Golden.

3                 THE COURT:  Proceed.

4                 MR. HOEGE:  Your Honor, if you'll forgive

5    me, I may ask some questions for the sake of continuity

6    that have already been established by the proffer.

7                 THE COURT:  It's okay as long as it doesn't

8    get too repetitive.

9                        DIRECT EXAMINATION

10   BY MR. HOEGE:

11     Q.  Mr. Golden, we've been talking about the

12   formation of the 2005 affidavit.  What was the purpose

13   of the call that you received from Dr. Putz?

14     A.  Dr. Putz first called me mid May of 2005 about

15   the ownership problem of the bungalow and indicated at

16   that time that he was in the process of court hearings

17   to try and reverse the situation, but needed an

18   affidavit to support his evidence.  I told him at the

19   time, I did not have anything as far as the original

20   purchase and sale.  He agreed to send me copies, which

21   he did, and included the affidavit that he drafted and

22   directed me to sign and send back to him as soon as

23   possible.  This all occurred within a week.

24     Q.  Did you have any input into the language of the

25   affidavit?

1     A.  No.

2     Q.  What did you do after you had received the

3  affidavit?

4     A.  I read it and then took it to the title company

5  that I used.  Had it notarized and immediately sent it

6  back to him.  As I said, it was solely for the purpose

7  of his court case at the time.

8     Q.  When did you execute the affidavit?

9     A.  May 31, 2005.

10     Q.  Why did you return it to Dr. Putz?

11     A.  He directed me to return it to him.

12     Q.  Did Dr. Putz provide you anything to sign the

13  affidavit, to execute the affidavit?

14          THE COURT:  You mean, did he pay anything?

15  BY MR. HOEGE:

16     Q.  Did he pay anything to you to execute the

17  affidavit?

18     A.  He directed me to sign the affidavit, get it

19  notarized and get it back to him so he could use it for

20  his defense in French Polynesia.

21     Q.  Just to be clear, again, I'm asking, did he pay

22  you anything to do that?

23     A.  No.

24     Q.  Did he promise you anything to do that?

25     A.  No.

1          THE COURT:  When you use the word

2    "directed," that's what was requested of you to do, is

3    that right? He didn't stand there with a gun at your

4    head.  He didn't have any authority over you to make you

5    do something you didn't want to do, right?

6          THE WITNESS:  I wanted to help him at the

7    time.

8          THE COURT:  Right.  So that's the context in

9    which you used the word directed.

10          THE WITNESS:  Yes.

11   BY MR. HOEGE:

12     Q.  During the intervening time between the

13   transaction in 1987 and the phone call in 2005 from Dr.

14   Putz, how many times did you talk to him during that

15   time?

16     A.  None, never.

17     Q.  Did you ever get a call for funds from the SCIP

18   from 1987 to 2005?

19     A.  No.

20     Q.  Did you ever get invited to a general meeting or

21   General Assembly of the SCIP between 1987 and 2005?

22     A.  From the date of closing to 2005, no.

23          MR. HOEGE:  I have nothing further, Your

24   Honor.

25          THE COURT:  Mr. Lowry?

1                    CROSS-EXAMINATION

2    BY MR. LOWRY:

3        Q.   Dr. Golden, let me hand you a document and ask

4    you if you recognize that as being a copy of the

5    affidavit you signed?

6        A.   Yes.

7        Q.   In the telephone conversation you had with Dr.

8    Putz, you indicated to him you were willing to sign an

9    affidavit, didn't you?

10       A.   At his request, for his court case in French

11   Polynesia.  That was the whole substance of our

12   conversation.

13       Q.   Did you hear my question?

14       A.   Pardon me?

15       Q.   My question was, you told him over the phone you

16   would agree to sign the affidavit, did you not?

17       A.   I didn't verbally say I would sign it, but he

18   directed me to sign it and get it back to him. I didn't

19   say, yes, I'll be happy to sign it for you.

20       Q.   What did you say?

21       A.   Discussed the fact that he needed this for

22   statement of facts for his court case in French

23   Polynesia.

24       Q.   When he told you he needed it, what did you say?

25       A.   I didn't say anything.

1          THE COURT:  He told the Court just a second

2  ago that he wanted to help.

3          MR. LOWRY:  Right.  I understand that.

4          THE WITNESS:  He wanted me to provide

5  evidence, the statement of facts.

6  BY MR. LOWRY:

7     Q.  When you received it, I think you testified you

8  read it, right?

9     A.  I read through it, yes.

10    Q.  And you signed it, under oath?

11    A.  I signed it, had it notarized, if that means the

12  same.

13    Q.  Look at the second page, please.  The notary says

14  it was sworn to before her on May 31, 2005.  Is that

15  accurate?

16    A.  I didn't actually swear that I did something.  It

17  was notarized like I do everything in the state of

18  Washington.

19    Q.  Do you understand it was under oath?

20    A.  Not to the extent that it was under oath.  I

21  thought she was just authorizing my signature.

22    Q.  Did you see anything on there -- let me start

23  that again.

24          Did you intend to say anything in this affidavit

25  that was not true?

1    A.  Frankly, I didn't read it thoroughly at the time

2    and just wanted to get it back to him, Dr. Putz, for his

3    court case.

4    Q.  Now you've said twice that you read it. Did you

5    intend for anything in there to be a statement by you

6    that was not true? Did you intend to state an untruth?

7    A.  I don't recall.

8    Q.  So you might have intended to state an untruth?

9            MR. HOEGE:  Objection, Your Honor;

10   relevance.

11           THE COURT:  He's been somewhat evasive.

12   This is a bench trial.

13           Here's the question.  If anything that you

14   knew, you knew it was going to be submitted in support

15   of trying to get the deed conveyed to him through the

16   court proceeding, correct?

17           THE WITNESS:  Right.

18           THE COURT:  And the conveyance of the deed

19   through the court proceeding was the end result of

20   whatever this agreement was that y'all had for him to

21   pay money for the bungalow, to you.  You understand

22   that?

23           THE WITNESS:  (No response).

24           THE COURT:  You understand the court

25   proceeding was part of the process by which Dr. Putz was

 1  trying to complete the transaction?

 2              THE WITNESS:  After he explained it to me,

 3  yes.

 4              THE COURT:  You knew that this was going to

 5  be filed in the court proceeding, right?

 6              THE WITNESS:  Yes.

 7              THE COURT:  You said it was for his court

 8  proceeding.

 9              THE WITNESS:  Yes.

10              THE COURT:  You didn't intend to mislead the

11  court in French Polynesia about anything concerning --

12  set forth in the affidavit, did you?

13              THE WITNESS:  No.

14              THE COURT:  So you intended for this to

15  represent what you believed to be true.

16              THE WITNESS:  At the time, yes.

17  BY MR. LOWRY:

18     Q.  Did you send it to him in Orange, Virginia?

19     A.  I'm sorry?

20     Q.  Did you mail it to Dr. Putz, in Virginia?

21     A.  Yes.

22     Q.  After that period of time, did you have further

23  telephone conversations with Dr. Putz over time?

24     A.  Not for a long period of time.

25     Q.  Ever?

```
 1      A.   Pardon me?

 2      Q.   Ever?

 3      A.   After --

 4           MR. HOEGE:  Objection, Your Honor;

 5   relevance.

 6           THE COURT:  At any time between then and the

 7   filing of the lawsuit.

 8           MR. LOWRY:  That's fine. I should have cut

 9   it off then.

10           THE COURT:  Sustained to that extent.

11           What's the answer?

12           MR. LOWRY:  The answer is before the filing

13   of the lawsuit, he had other conversations with him.

14   BY MR. LOWRY:

15      Q.   Is that correct?

16      A.   Correct.

17      Q.   Did you exchange e-mails with him?

18      A.   Yes, I did.

19      Q.   Was the subject matter of those conversations and

20   the e-mails the continuing effort on his part to get the

21   transaction completed?

22      A.   On both our parts.

23           MR. HOEGE:  Objection, Your Honor; beyond

24   the scope of direct.

25           THE COURT:  Overruled.  This is
```

1   cross-examination.

2   BY MR. LOWRY:

3       Q.  I believe the answer was, on both your parts,

4   that was the purpose.  Isn't that what you said?

5       A.  Yeah.

6       Q.  And when you e-mailed him, you e-mailed to him at

7   his address here in Virginia, right?

8       A.  It's the only e-mail I had.

9       Q.  That means yes.

10      A.  Yes.

11      Q.  And when you talked to him on the telephone, he

12  was in Virginia, correct?

13      A.  I assume, yes.  A couple times, he was in Texas.

14      Q.  Sometimes in Texas and sometimes in Virginia?

15      A.  As I remember, yeah.

16              MR. LOWRY:  That's all I have.

17              THE COURT:  Any redirect, counsel?

18              MR. HOEGE:  No, Your Honor.

19              THE COURT:  You may step down, sir.

20              MR. HOEGE: May I have a moment, Your Honor?

21              THE COURT:  Of course.

22              MR. HOEGE:  We have nothing further, Your

23  Honor.

24              THE COURT:  Do you have any rebuttal?

25              MR. LOWRY:  No, sir.

1          THE COURT:  Do you wish to present argument

2    or do you want to have the Court take it under

3    advisement and allow y'all further consideration over

4    the matters we took a break for earlier today?

5          MR. LOWRY:  The latter.  That would be my

6    request.

7          MR. HOEGE:  Absolutely, Your Honor.

8          THE COURT:  I want to make a couple of

9    observations because I think it would be helpful for

10   y'all to know at least some of the things the Court is

11   thinking in order to help frame what y'all are doing

12   here.

13          First of all, I want to say that the

14   principles in this lawsuit, because the Court had some

15   dealing with them during the break, I understand your

16   dilemma.  I sympathize with it from the standpoint that

17   it's not an easy thing to resolve because it does

18   involve events and circumstances that are totally under

19   control of a foreign state.  Yet there are other

20   circumstances that are within your control that have

21   occurred in the past and some I hope will occur in the

22   future, but that's left to be seen.

23          When Judge Moon ruled without a hearing, it

24   was basically that the affidavit itself constituted part

25   performance and that's a legal matter that counsel for

1    the defendants has taken some issue with and challenges

2    whether that's an appropriate conclusion.

3              I do want to say that there's nothing that's

4    been presented today that would indicate that the

5    affidavit was executed under circumstances that would

6    demonstrate that Dr. Golden's will was overborne.  I

7    want you to understand that.  I don't think he even

8    suggested that it was.  I think he wanted to be honest

9    with his answers.  Yet when pressed, he was.  I respect

10   that a great deal.  Whether they help him or not is a

11   different question.

12             I do want to tell the parties, I'm not so

13   sure this case is in any different legal position than

14   it was in before the hearing was conducted.  I'm only

15   saying that not to benefit or harm one side or the

16   other, but to let you know what I'm thinking because I

17   think it will help the parties deal with it.  Whether

18   this case is here or in Washington state, it's going to

19   cost everybody money. I'm saying it publically because

20   I've said it to the parties privately and I have nothing

21   to hide.

22             I'm going to leave it at that. But I'm just

23   not so sure anything has changed what Judge Moon has

24   done, even though, as promised to counsel for the

25   defendant, I'm keeping an open mind.

1           I will reassess these and give it the same

2   due diligence I gave it before the hearing began.  The

3   law is the law as far as what the contacts are.

4           One of the things that is disconcerting to

5   me, to the Court, is the fact that when the courts use

6   the term significant, I don't know if any of y'all

7   watched the championship Lacrosse weekend, but the

8   players have to get the ball across the magic line

9   within ten seconds.  This is very similar.  When they

10  touch the inside of the line, they're in because they

11  intended to do what they intended to do.  Whether that

12  constitutes whether this part performance is, as a

13  matter of law, significant, that's the issue.  Not

14  whether it constitutes part, but whether itself is

15  significant as a matter of law or whether this rises to

16  the level of significant contacts is the real crux of

17  the issue here.  That's what I would have to resolve.

18          There's some good things that have come out

19  for the defense, there are some not so good things that

20  have come out for the defense. At first blush, as far as

21  the affidavit is concerned, it is today what it was when

22  Judge Moon looked at it.  I just want everybody to know

23  that.  Nothing has changed that.

24          Now, go out and settle the case.  But if

25  not, I'm happy to rule and we'll have a written opinion.

1          MR. HOEGE:  Your Honor, how long is it

2     continued for, may I ask?

3          THE COURT:  I think we can give you a week

4     or two.

5          Judge Moon and I have been in communication

6     on this because I had to get an order entered to allow

7     me to mediate after I had already started.  This is

8     early on in the process. This case is not an old case.

9     Y'all are exercising due diligence and raised a

10    significant legal question.  I think we can give you

11    some breathing room.

12         MR. LOWRY:  Why don't we say two weeks and

13    we'll contact the Court one way or the other jointly?

14         THE COURT:  And if I can help in telephone

15    conversations among counsel, I don't mind being brought

16    in the loop, if it would help y'all resolve the matter.

17    I'm just a phone call away.  If the parties don't

18    object, I'd be happy to try to help.

19         Nice meeting you, Dr. Putz.

20         DR. PUTZ: Thank you, Your Honor.

21         THE COURT:  Nice meeting you, Doctor and

22    Mrs. Golden, and we hope things resolve.

23         We're in recess.

24

25

1                        **INDEX**

2      **WITNESS FOR DEFT.**          **Direct**    **Cross**

3      Michael Golden              31        35

4

5      **EXHIBIT NO.**                 **Marked**    **Admitted**

6      Deft. #1                    23        23

7

8

9

10

11

12     "I certify that the foregoing is a correct transcript

13     from the record of proceedings in the above-entitled

14     matter.

15

16

17     /s/ Sonia Ferris                  October 23, 2009"

18

19

20

21

22

23

24

25