```
 1              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF VIRGINIA
 2                 Charlottesville Division

 3

 4   DR. HERBERT R. PUTZ,          Civil No. 3:09cv00003
     Et al.,
 5
                 Plaintiffs,
 6
                 vs.                Charlottesville, Virginia
 7
     MICHAEL H. GOLDEN and
 8   SUZANNE C. GOLDEN,

 9               Defendants.   June 23, 2009

10
                    TRANSCRIPT OF HEARING
11        BEFORE THE HONORABLE B. WAUGH CRIGLER,
               UNITED STATES MAGISTRATE JUDGE
12

13   APPEARANCES:

14   For the Plaintiff:
                              Michie Hamlett Lowry
15                            Rasmussen & Tweel
                              EDWARD B. LOWRY, ESQ.
16                            P.O. Box 298
                              Charlottesville,VA
17                            22902-0298

18
     For the Defendant:
19                            Richmond & Fishburne
                              HOWARD H. HOEGE, III, ESQ.
20                            214 E. High St.
                              Charlottesville,VA 22902
21
     Court Reporter:          Sonia R. Ferris, RPR
22                            U.S. Court Reporter
                              255 W. Main St. Room 304
23                            Charlottesville, VA 22902
                              434-296-9284
24

25   Proceedings recorded by mechanical stenography;
     transcript produced by computer.
```

1            THE COURT:  Let the record reflect that this

2    is 3:09cv3, Herbert R. Putz, et al., versus Michael H.

3    Golden.

4            We're here to conclude the proceedings that

5    began the other day where we took some evidence and I

6    think the parties withheld argument pending an attempt

7    to resolve the matter on their own, which didn't occur.

8            I'll be happy to entertain argument.

9            I guess since there's a challenge to

10   jurisdiction and the plaintiff has the burden of proving

11   jurisdiction, I guess it's on you, Mr. Lowry.

12           MR. HOEGE:  Your Honor, if I may, before we

13   begin, I think there may be two evidentiary concerns to

14   clear up from last time that have surfaced from last

15   time. I don't know if you would count this as an

16   evidentiary concern or not, relative to the French Court

17   ruling.  But one would be to clarify what the French

18   Court ruled, number one.  Number two is, you had asked

19   that maybe we present something that would suggest that

20   an affidavit is not contract performance.

21           THE COURT:  You said you were going to argue

22   the legal effects of what had taken place.  That's up to

23   you.  If it's citing to cases, I mean, you certainly

24   have the right to refer to cases in your argument.

25           Do you have any objection to the ruling of

1  the Polynesian or whatever it is Court --

2              MR. LOWRY:  We have a lot of objections.

3              THE COURT:  -- being introduced into

4  evidence.

5              MR. LOWRY:  No, I don't, and I'd like to

6  speak to that issue.

7              There's an issue between the parties as to

8  how those orders are interpreted.  As to the lower

9  Court, we have only the English translation. As to the

10  appellate Court, we have both the French version and

11  certified English translation.

12              THE COURT:  I'll only read one.

13              MR. LOWRY:  I understand.  But our opinion

14  first is how or even if the Polynesian courts ruled is

15  totally irrelevant to this jurisdictional issue.

16              THE COURT:  I do question the relevance and

17  would address it in an opinion.  If there's no objection

18  to having it in there, for whatever it's worth, we can

19  "Judge Turk" it and receive it for whatever it's worth

20  and it may not be worth anything.

21              MR. LOWRY:  I have no objection to that.

22              THE COURT:  Except for context.

23              MR. LOWRY:  I have no objection to it being

24  introduced for whatever relevance it may have.

25              THE COURT:  Do you want to present that, Mr.

1    Hoege?

2                    MR. HOEGE:  Yes, Your Honor.  I'm using the

3    plaintiff's copy of these documents.

4                    THE COURT:  They'll be received as a joint

5    exhibit if that's okay, today.

6                    MR. HOEGE:  That's fine.

7                    MR. LOWRY:  That's fine.  As a matter of

8    fact, we can give this set of exhibits.

9                    THE COURT:  What is that?

10                   MR. LOWRY:  That's the original contract.

11                   THE COURT:  Do you want me to receive that

12   as a collective exhibit?

13                   MR. HOEGE:  These are repetitive of the

14   exhibits attached to the complaint, with the exception

15   of 4 and 5.

16                   THE COURT:  If they're all together as part

17   of an evidentiary hearing, then we don't have to go back

18   through looking through the complaint.

19                   MR. LOWRY:  If there's no disagreement those

20   are valid and relevant, just put them all in as a

21   package.

22                   MR. HOEGE:  If I may, I think there are two

23   documents that are combined under #5 that I'd like to

24   separate out, Your Honor.

25                   MR. LOWRY:  If you want to call them 5 and

1    5A, I have no objection.

2            MR. HOEGE:  May I confer with counsel?

3            THE COURT:  Sure.

4            We're off the record.

5            (Counsel conferred).

6            (Documents handed to the Court).

7            These will be received as Exhibits 1 through

8    5A, as a joint exhibit to the evidentiary hearing.

9            (Exhibits #1, #2, #3, #4, #5 and #5A were

10   marked for identification and admitted into evidence).

11           MR. LOWRY:  Yes, sir.

12           THE COURT:  Now, are we ready?

13           MR. HOEGE:  Yes, Your Honor.

14           THE COURT:  With the understanding that

15   whatever legal effect any of this may have, I'll

16   certainly permit you to argue it.

17           MR. HOEGE:  Absolutely, Your Honor.

18           THE COURT:  Proceed.

19           MR. LOWRY:  Just so you'll be aware of what

20   the issue is with respect to the orders, even though I

21   don't think they're relevant, I do want to point these

22   things out.

23           The parties have poured over the

24   translations. Mr. Hoege very appropriately gave me a

25   call and said he thought his reading of those orders

1    supported a position that what, in fact, had happened

2    was there was no ruling against Panonia Realty or Dr.

3    Putz, but in fact, the appellate Court had referred it

4    back to the lower Court for further proceedings, which

5    apparently never took place. I agree that that can be

6    one reading of those documents.  But I also feel that

7    both the lower Court's opinion and the appellate Court's

8    opinion are subject to interpretation.

9            THE COURT:  We don't have any authority to

10   interpret and compel anything of those courts.

11           MR. LOWRY:  No, I understand, but to the

12   extent it may be --

13           THE COURT:  Even if we have jurisdiction.

14           MR. LOWRY:  But to the extent Mr. Hoege may

15   argue it's relevant in terms of what the parties were

16   obliged to do before they came here, I think that's why

17   he was interested in them coming in. I'm about to tell

18   you why I don't think it matters.

19            If it could be absolutely proved that the

20   Polynesian courts never made a decision on this issue,

21   which I think is the best possible interpretation Mr.

22   Golden can put on it, it doesn't affect anything,

23   because our case is Dr. Golden was contractually bound

24   to make a conveyance of property to Dr. Putz.

25            THE COURT:  Can I ask question? There was a

1   lot of testimony about what Dr. Golden did and I was

2   under the impression that there was no debate that

3   whatever he was doing was in an effort, by his own

4   testimony, to honor the contract that he and his wife

5   both entered into.

6           MR. LOWRY:  That was my understanding.

7           THE COURT:  Are you claiming that he did

8   this on his own, Mr. Hoege?

9           MR. HOEGE:  Your Honor, what I'm saying is

10  that he was contacted 18 years after the contract to

11  provide help in litigation.

12          THE COURT:  Whether he helped or didn't

13  help, whatever he was doing was considered -- he was

14  acting for himself and his wife, I take it.

15          MR. HOEGE:  He didn't testify to that.

16          THE COURT:  He didn't.

17          MR. LOWRY:  I thought he testified actually

18  on questions from the Court that he did sign it, that he

19  intended it to be what it said.

20          THE COURT:  Right.

21          MR. LOWRY: And he sent it to Virginia.  To

22  me, that's the critical evidence.

23          THE COURT:  My question is, where will it

24  get you if we've got jurisdiction over him and not her

25  and where it will get you if we have jurisdiction over

1  him and not her? Do you understand what I'm trying to

2  get at? It's a gap.  I'm not the lawyers in the case,

3  but I notice the gap and we're here and we can either

4  close the gap or leave it where it is.  It makes no

5  difference to me.

6           MR. LOWRY:  I think that there's joint and

7  several liability anyway, so I think whether or not she

8  is a party before the Court is not dispositive.

9           THE COURT:  I'm not answering that question.

10  The only thing I'm posing is that his testimony was his

11  testimony.  There's no dispute in the record that both

12  signed the underlying contractual agreement to sell.

13  Both essentially received the money and it could be

14  inferred that he was acting on behalf of both. It might

15  not be, but it could be.  If it's not, the best you're

16  going to get is we've got jurisdiction over him and not

17  over her and the worst y'all are going to get is we've

18  got jurisdiction over him and not over her.  And it

19  would probably be best to say we either have it over

20  both or neither.  But I can't compel that stipulation.

21           Do you understand where I'm coming from?

22           MR. LOWRY:  I do understand where you're

23  coming from.

24           MR. HOEGE:  Yes, Your Honor.

25           THE COURT:  Again, I'm only taking the facts

1    that are presented to me.  If I try the case, I may lose

2    it.

3              MR. LOWRY:  I understand.

4              There is some confusion in that the original

5    agreement was between Michael Golden and Herbert Putz.

6    The addendum says Michael Golden and Susan Golden and

7    Mr. Putz. I agree that that leads to some confusion, but

8    at the very least, under the original agreement, it was

9    his obligation to convey the interest and if that meant

10   he had to go get his wife to sign, then he undertook

11   that contractual obligation.

12             THE COURT:  And how that plays out will just

13   play out.

14             MR. LOWRY:  But I thank you for raising the

15   issue.

16             So when we get back down to it, my only

17   point on the Polynesian --

18             THE COURT:  I feel like the people in the

19   Star Wars ship that found safe haven in the cave that

20   was nothing but a giant monster.

21             MR. LOWRY:  The mouth of the monster.

22             This case may have more complexity than the

23   dollars involved even.

24             THE COURT:  That's the problem.

25             MR. LOWRY:  At any rate, as it's postured

1   today before the Court, I think the only real question

2   is whether or not there was a contractual obligation on

3   the part of Dr. Golden to make the transfer --

4           THE COURT:  Isn't the real question whether

5   Judge Moon's original findings need to be disturbed?

6           MR. LOWRY:  That's where I'm headed.

7           THE COURT:  Isn't that really where we are?

8           MR. LOWRY:  Absolutely.

9           THE COURT:  Either the evidence does change

10  the factual mix where I would recommend it change the

11  outcome or it doesn't change the factual mix where I'd

12  recommend he reaffirm the outcome.

13          MR. LOWRY:  Yes.

14          To that end, I ought to just probably shut

15  up and sit down and hear what Mr. Hoege has to say, but

16  I will say one thing first before I do that and that is

17  this. I think the fact that Dr. Golden has admitted on

18  the stand --

19          THE COURT:  He said what he said.

20          MR. LOWRY:  Right.  And the fact that what

21  he said was he sent it to Virginia, intended to be bound

22  by it and it was in furtherance of his obligation under

23  the contract, I believe that's all in his testimony and

24  we can all look at it, to me that ices the matter and

25  there is no reason to upset Judge Moon's opinion.

1            I'll refrain from saying anything else until

2    rebuttal.

3            MR. HOEGE:  Thank you, Your Honor.

4            I'd like to pick up with just the last

5    characterization of Dr. Golden's testimony.  I don't

6    believe he ever testified that he signed the affidavit

7    with the idea that it was a continuing obligation under

8    a contract that he performed under 18 years prior.

9            THE COURT:  I've got his testimony written

10    down and I'm going to attempt to repeat it as honestly

11    as I can without having the transcripts of it before me.

12            MR. HOEGE:  Thank you, Your Honor.

13            Your Honor, you were questioning the

14    relevance of the interpretation of the French Polynesia

15    Court ruling.

16            THE COURT:  I did.

17            MR. HOEGE:  For that, I would ask you to

18    start by taking a look at Judge Moon's opinion because

19    you also just phrased the question as, do we have to

20    disturb his factual findings.  Two things about Judge

21    Moon's opinion. One is, he was approaching that from a

22    presumption that the factual pleadings as presented by

23    the plaintiff were true and he had to take them in the

24    light most favorable to the plaintiff because that's

25    what you do when you reach a decision on a motion for

1   lack of personal jurisdiction, motion to dismiss.

2            THE COURT:  Only the jurisdictional facts.

3            MR. HOEGE:  Correct.

4            We're in a separate ball game now that we

5   have an evidentiary hearing.  In the evidentiary

6   hearing, they have to prove by a preponderance of the

7   evidence that jurisdiction exists.  So it's a higher

8   evidentiary threshold.

9            Judge Moon then, in his opinion, keys the

10  characterization of the affidavit as contract

11  performance off of the plaintiff's representation and

12  his acceptance of the French Polynesia Court decision

13  declaring that they were not owners. That's where the

14  relevance comes from.

15           I can direct you to specific language in

16  Judge Moon's opinion if you'd like me to Your Honor.

17           THE COURT:  Let me just ask you this.

18  Irrespective of whether that's the way to characterize

19  Judge Moon's opinion or not, isn't it a fact that the

20  plaintiff has never been able to receive title?

21           MR. HOEGE:  There is no evidence before this

22  Court that that is the case.

23           THE COURT:  Does he have title? It's

24  alleged, right?

25           MR. HOEGE:  It's alleged.

1          THE COURT:  And it's alleged that he's

2    attempted to get title and can't.

3          MR. HOEGE:  It's alleged, but we're in an

4    evidentiary --

5          THE COURT:  We're in an evidentiary hearing

6    over jurisdiction, not over the correctness of the

7    allegations of the complaint as they go to the merits of

8    the case.

9          MR. HOEGE:  That's right.  But part of

10   assessing the jurisdiction question is, what is the

11   nature of the contact with Virginia? I believe that

12   that's a fair statement.  You directed us to look at

13   Consulting Engineering Company and apply that framework.

14         THE COURT:  Only in the context, is this a

15   substantial attempt to perform? Is it an effort to

16   perform as Judge Moon construed it? Because I'm going to

17   tell you I'm not going to mess with the law that he set

18   down. I'm just not going to do it. Now, I may say that

19   his findings lacked evidentiary support and ask that he

20   revisit that, but that's all.  The way that he construed

21   the law is the law. The question is how do we apply that

22   law to the facts that we have here.

23         MR. HOEGE:  I agree with that.

24         So the facts flow from the plaintiff's

25   allegations.  What I'm trying to reinforce here -- and

1   maybe it's best if we proceed by just taking a look

2   quickly at the French Polynesia opinions.

3           If you look at tab four -- and again, I

4   think this is important because Judge Moon, he did not

5   have access to two of these documents and they are

6   representations which are just absolutely inaccurate in

7   both the plaintiff's complaint and all the hearings to

8   this point.

9           If you look at sub four -- this is a Court

10   order -- of a date that precedes, predates the

11   affidavit, predates the affidavit.  If you look to the

12   last page --

13           THE COURT:  Penultimate page.  It says, "we

14   determine."

15           MR. HOEGE:  That's right.

16           THE COURT:  "We declare."

17           MR. HOEGE:  "We declare that we are without

18   jurisdiction and dismiss the parties so that they can

19   refer to a superior jurisdiction."

20           So the trial Court dismissed for lack of

21   jurisdiction.

22           THE COURT:  We don't know what that means

23   under French law.

24           MR. HOEGE:  I think if we follow the

25   remainder of the Court opinions, we'll see that lack of

1  jurisdiction --

2          THE COURT:  If they dismiss and send it to a

3  superior Court, is it because they want the other Court

4  to entertain the matter substantively? I don't know.

5          MR. HOEGE:  But this is not a ruling that

6  he's not the owner.

7          THE COURT:  But it's not a ruling that he

8  gets title either, is it?

9          MR. HOEGE:  No, that's correct.

10          Then if you go to sub five, Exhibit 5,

11  you'll see a French document, which I wouldn't pretend

12  to be able to define. Once you get about halfway

13  through, you'll see a page called "Findings," in

14  English.

15          THE COURT:  That's under 5A?

16          MR. HOEGE:  No, this is under 5.

17          THE COURT:  It says for the reasons -- no.

18          MR. HOEGE:  No, Your Honor.  It's the page

19  immediately following the French language in tab five.

20          THE COURT:  Okay.

21          MR. HOEGE:  At the top right-hand corner,

22  you're looking at the word "copy."  You'll see that this

23  document says, at the top, "to the president and the

24  attorneys making up the Court of Appeal."  You'll see

25  that four, the SCIP, midway through the page, there's

1   the attorney for the SCIP is identified as Mr. Herman Eu

2   Claire.

3          THE COURT:  Okay.

4          MR. HOEGE:  You'll see on the following

5   page, Your Honor, the words "may it please the Court" at

6   the top.

7          THE COURT:  I do.

8          MR. HOEGE:  Which appears to be a briefing.

9          THE COURT:  I don't know what it is, but it

10  says "may it please the Court."

11         MR. HOEGE:  If we continue then, we can see

12  language that continues and then at the end of this

13  document that's titled "may it please the Court," you'll

14  see that the signature offered is that of Herman eu

15  Claire, the attorney for the SCIP. So the only

16  reasonable inference here is that this is the SCIP

17  briefing for the appellate Court.

18              This is important because in paragraph 18 of

19  the complaint, of the plaintiff's complaint, the Court

20  cites that document that we just read -- not the Court,

21  but the plaintiff cites that document that we just read

22  as the Court order holding that he is not the owner,

23  that he does not have title in the case or title in the

24  property.

25              THE COURT:  Let me just ask you this. Is

1   this an effort to convert a personal jurisdiction

2   objection to a case or controversy objection?

3            MR. HOEGE:  No, Your Honor.

4            THE COURT:  I want to make sure of that.

5            MR. HOEGE:  Yes, Your Honor. Absolutely we

6   are not attempting to argue the merits, but

7   unfortunately --

8            THE COURT:  That wouldn't be the merits.

9   That would be subject matter jurisdiction if there's no

10  case or controversy.

11           MR. HOEGE:  Yes, Your Honor.

12           THE COURT:  I just wanted to make sure

13  you're not attacking the subject matter jurisdiction.

14           MR. HOEGE:  We're not at this time, Your

15  Honor.

16           THE COURT:  But making it curious because

17  that can be attacked at any time.

18           MR. HOEGE:  Your Honor, at this time, we are

19  not.  I was provided two of these documents the day of

20  the last hearing so we're just digesting it now.

21           But then the plaintiff's complaint goes on

22  to attribute to the Court order language out of the SCIP

23  attorney's briefing.

24           THE COURT:  Let me ask you this and it may

25  cut through a lot of stuff and it's not that I don't

1     appreciate where you're headed.

2           Let's assume that the lower Court did

3     nothing and the appellate Court did nothing to the

4     nothing and sent it back for nothing and the parties

5     believed there was still something to do and Dr. Putz

6     called your client, Golden, and said we have something

7     to do and Golden believed he had something to do and did

8     something.  Does that change Judge Moon's opinion?

9           MR. HOEGE:  Yes, it does, Your Honor.

10          THE COURT:  How?

11          MR. HOEGE:  Because the Goldens' position

12    regarding the affidavit is that it is merely a

13    recitation of past, complete performance.  There is not

14    one word in the affidavit --

15          THE COURT:  Even if both sides believe

16    there's still something to do.

17          MR. HOEGE:  But both sides don't believe

18    there is something left to do.

19          THE COURT:  Now they dont, but it's a

20    question of then.

21          MR. HOEGE:  Then he was helping with

22    litigation because he was asked to help with litigation.

23    That was purely gratuitous. He received zero benefit.

24          THE COURT:  What difference does it make if

25    he's still performing under the contract?

1          MR. HOEGE:  No, Your Honor.

2          THE COURT:  I'm just -- not that I'm

3    disagreeing with you, but what difference does it make

4    if he has an ernest belief that he's still performing

5    under the contract?

6          MR. HOEGE:  Your Honor, let me read to you

7    the language from Judge Moon's opinion.

8          THE COURT:  But based on your theory, you

9    would have to show that this case is totally

10   unmeritorious and based on that, there's no jurisdiction

11   and doesn't that get the cart before the horse?

12         MR. HOEGE:  No, Your Honor.

13         THE COURT:  Okay. I'm hearing you.

14         MR. HOEGE:  Right, Your Honor, and here's

15   why I keep raising it.

16              Page eleven of Judge Moon's opinion is a

17   conditional interpretation of the affidavit.  If you

18   look four sentences up from the bottom of the page, his

19   conditional interpretation of the affidavit is if the

20   contract is to be performed, then the defendants have

21   continuing obligations.  There is not a shred of

22   evidence before this Court -- I don't think the Court

23   would even have to interpret whether or not the contract

24   had ever been performed.

25              THE COURT:  This is where I'm confused and

1  honestly so because if you're telling us as the District

2  Court that we have to determine the merits of whether

3  there's any performance yet to occur in order to

4  determine whether there's jurisdiction, we would never

5  have jurisdiction to determine the substantive merits of

6  performance.

7             MR. HOEGE:  Right.

8             THE COURT:  And when we did determine the

9  substantive merits of performance, then we'd say we

10  don't have jurisdiction, and that just seems strange.

11            MR. HOEGE:  Your Honor, that's our issue

12  with Judge Moon's opinion. We didn't do that.  Judge

13  Moon did that.  The problem with that opinion is that --

14  I just lost my -- let me look at my language here, Your

15  Honor.

16            THE COURT:  He said "if."

17            MR. HOEGE:  Number one, it's conditioned on

18  a continuing obligation to perform.  The second is that

19  there's this really odd representation by the plaintiffs

20  or assertion that jurisdiction does not grow from the

21  underlying contract.  Remember, one of the tenants of

22  Consulting Engineering and every other specific

23  jurisdiction case is that the case or controversy arises

24  out of the minimum contacts.

25            In this case, the affidavit gives rise to

1  nothing.  The contract itself --

2          THE COURT:  Let me ask you this because this

3  is unbelievably interesting. Let me just ask you this.

4  Let's assume the plaintiff alleges there's a contract

5  and alleges in a simple way that the defendant, in

6  exercise of performing the contract, had contact with

7  Virginia and then there's no challenge to the -- there's

8  no -- there's a challenge to the underlying jurisdiction

9  and they can say, well, the defendant shipped X to the

10  plaintiff into Virginia.  Then let's say at the end of

11  the case, the Court determines there was no contract.

12  Now, does that defeat personal jurisdiction or does

13  personal jurisdiction determine first and then you

14  determine the merits of the case on whether there's a

15  claim for breach of contract or for fraud?

16          MR. HOEGE:  That's my problem with the

17  characterization of the issue now.

18          THE COURT:  But then you wanted us to

19  determine that based on an interpretation of a French

20  document that I can tell you, and I'll tell the world,

21  even the Court of Appeals, I have no earthly idea what

22  that means.

23          MR. HOEGE:  Absolutely, except that --

24          THE COURT:  Except the allegations are he

25  was deprived of the opportunity to take title.

1          MR. HOEGE:  That's right.  That works fine

2    for the Goldens' position as well, Your Honor, in which

3    case you're saying I can give no credence or credibility

4    to the French court's ruling or holding.

5          THE COURT:  What I'm saying is that under

6    that interpretation, the French ruling is immaterial as

7    to whether or not under the facts alleged in the

8    complaint there's jurisdiction based on the

9    jurisdictional facts that have been demonstrated at the

10   hearing.  That's where I'm coming from.

11         MR. HOEGE:  Yes, Your Honor.

12         THE COURT:  Is it semantics? Partially.  But

13   is it substance whether it comes to jurisdictional

14   issues? Yes.

15         MR. HOEGE:  I don't think it's semantics at

16   all, Your Honor. In fact, this is the great issue

17   flowing from that opinion.

18         THE COURT:  This one may make it to the

19   Supreme Court, over 118 or 20 or $30,000.

20         MR. HOEGE:  The issue for us, Your Honor, is

21   all of the other -- virtually all of the other personal

22   jurisdiction questions say that the case or controversy

23   flows -- every single opinion says the case or

24   controversy has to flow out of the minimum contact.  In

25   this case --

1          THE COURT:  No, that is not what they say.

2          MR. HOEGE:  Okay.  What do they say, Your

3    Honor?

4          THE COURT:  They say the minimum contact

5    arises out of the case or controversy because it says if

6    you do business and have contact in the process of doing

7    business, you conferred jurisdiction on the forum Court.

8    It's just the reverse, respectfully submitted.  I'm

9    respectfully suggesting that the jurisdiction over the

10   person arises out of the case or controversy that arises

11   out of the business relationship between the parties.

12         MR. HOEGE:  Out of the -- the sequence is

13   correct, Your Honor.  If I can, I'll just quote

14   Consulting Engineering Corporation.

15         THE COURT:  Please do. Hit me hard.

16         MR. HOEGE: Second prong is whether the

17   plaintiff's claims arise out of those activities

18   directed at the state.

19         THE COURT:  But see, that's only on the tail

20   ends of the context.  The context is business deal

21   allegedly gone awry, with alleged consequences, out of

22   which arise activities which touch upon the state

23   sufficiently for the person who is hailed into the state

24   to have anticipated he would be sued in the state if he

25   didn't perform.

1          MR. HOEGE:  I think it reaches back further

2    than that, Your Honor. We can go through Consulting

3    Engineering --

4          THE COURT:  Oh, I will.  I'll read it again.

5          MR. HOEGE:  Because that initial formation

6    of the contract is what matters.

7          THE COURT:  No, it can be either in the

8    formation or in the performance or both or because,

9    let's say the defendant comes in for anything touching

10   upon the contract and subjects themselves to the

11   jurisdiction of the Court.  So the context is the

12   business arrangement out of which activity occurs that

13   creates a cause of action and out of which there is

14   conduct that touches the forum state, is the way I read

15   it.

16          Listen, I'm just an old country lawyer.  I

17   may be wrong.

18          MR. HOEGE:  Your Honor, I would tell you

19   that there are only two cases that are even remotely

20   close to our set of facts, which is that the contract

21   was formed with absolutely nothing to do with the forum

22   state.  The party notice in the forum state --

23          THE COURT:  We have Judge Wilkinson's famous

24   putrefied reindeer antler case.

25          MR. HOEGE:  Do you have a copy of it, Your

1 Honor?

2         THE COURT: I don't need it. It's indelibly

3 carved in my mind.

4         MR. HOEGE: Nana v. Chung.

5         I will leave where we're at because now

6 we're talking Nana v. Chung.

7         Let me back up. So Consulting Engineering

8 Corporation has a three-prong test. The first of those

9 prongs is the extent to which the defendant purposefully

10 availed itself of the privilege of conducting activities

11 in the state.

12         THE COURT: Okay.

13         MR. HOEGE: In this case, when the contract

14 --

15         THE COURT: I don't know what I did with my

16 copy.

17         MR. HOEGE: It's Exhibit A to the actual

18 plaintiff's response, if you've got it attached to the

19 plaintiff's response and motion.

20         THE COURT: Keep going.

21         MR. HOEGE: It's that prong that the Court

22 lays out the seven or eight factors that you use to

23 determine whether or not the defendant purposefully

24 availed himself of the privilege of doing what? Of

25 conducting business under the laws of the forum state.

1   The plaintiffs had not alleged that anything at all to

2   do with the contract formation and the initial contract

3   performance had anything to do with seeking to do

4   business in Virginia on either party.

5           THE COURT:  And they know they would lose if

6   that was the basis. The only basis that Judge Moon

7   utilized was that an act of performance occurred in such

8   a manner that it touched the Commonwealth of Virginia in

9   sufficient a way as to alert the defendant that they

10  would be hailed into Court.

11          MR. HOEGE:  That's right.

12          THE COURT:  The only way you can get around

13  that is to, one, his factual finding was wrong on

14  whether the activity occurred; or secondly, whether his

15  legal conclusion was wrong because it wasn't sufficient

16  performance to invoke the jurisdiction of the

17  Commonwealth over the defendant.  To me, those are the

18  only ways that you get around that.  That's why my

19  question to Mr. Lowry was, isn't it a question of

20  whether Judge Moon's findings or conclusions get

21  monkeyed with?

22          MR. HOEGE:  That's right.  So with respect

23  to his conclusions of law, the thing that was accepted

24  from the plaintiff's allegations and not explored in

25  terms of an evidentiary hearing were what was the

 1   purpose of that affidavit and what was the intention

 2   with the affidavit? With respect to that, the affidavit

 3   was executed not for use in a Virginia court, not for

 4   use in Virginia litigation.  It was executed for use in

 5   a Tahitian court, number one.

 6          THE COURT:  I can understand that.  I

 7   understand that argument and inference from the facts,

 8   yes.

 9          MR. HOEGE:  The affidavit is not in

10   agreement amongst the parties.

11          THE COURT:  It's not a separate

12   free-standing agreement.

13          MR. HOEGE:  It is not a separate or

14   free-standing agreement among the parties.

15          The affidavit makes -- unlike Judge Moon's

16   conclusion based on the plaintiff's allegations, the

17   affidavit makes no promise of future performance of

18   anything.

19          THE COURT:  Okay.

20          MR. HOEGE:  The affidavit, in fact, merely

21   recites past, complete performance.

22          THE COURT:  But that we have to draw from

23   your interpretation of the French court's documents.

24          MR. HOEGE:  No, Your Honor, that's from the

25   plain language of the affidavit.  Everything in the

1  affidavit is stated in the past tense and it declares

2  actual actions already taken in the past.

3          THE COURT:  So you say it's only a

4  declaration of past action.

5          MR. HOEGE:  Yes, Your Honor.

6          It was for use in litigation in which the

7  Goldens were not parties.

8          THE COURT:  Okay.

9          MR. HOEGE:  The Goldens and Dr. Putz or

10  Panonia Realty had never contracted for litigation

11  assistance, subsequent litigation assistance.  There's

12  no evidence at all that anything happened with that

13  affidavit in Virginia.

14          THE COURT:  Except that it was mailed to

15  Virginia and the allegation is it was received.

16          MR. HOEGE:  It was received and then it was,

17  what? The allegation is, and I think it was proffered,

18  the allegation is that it was forwarded and used in

19  Tahiti. We don't know that it was even opened in

20  Virginia.  There's no evidence of that.  It could have

21  been received in Virginia and immediately placed in the

22  mail, forwarded to an attorney in Tahiti.  The arrival

23  of the affidavit in Virginia had zero legal effect in

24  Virginia. There's no Virginia law that was triggered or

25  --

1          THE COURT:  Let me ask you this.  What if we

2   have this scenario? Goldens come to Virginia and get on

3   the Internet and type up something that gets sent to

4   Tahiti or French Polynesia or whatever the name of this

5   place is. It has some different names.

6          MR. HOEGE:  Bora Bora.

7          MR. LOWRY:  Paepaepupure.

8          THE COURT:  That place.

9          And then they leave again. Would we have a

10  different case?

11         MR. HOEGE:  There I would say, now we're

12  going away from the factual holdings of Judge Moon and

13  going into the legal interpretation.

14         THE COURT:  Judge Moon ruled what they did

15  was partial performance that ended up being in Virginia.

16  That's what he ruled.  He didn't say it fully performed.

17  He said it was an act of performance that touched the

18  Commonwealth.

19         MR. HOEGE:  But all of the cases that Judge

20  Moon cites, Your Honor, were all cases where the

21  original contracts where -- number one, the original

22  contract was negotiated and formed, in part, from

23  Virginia so that --

24         THE COURT:  This will be the first one

25  that's not.

1          MR. HOEGE:  It would be the only one that's

2    not, Your Honor. It's unprecedented.

3          THE COURT:  I think we've got some District

4    Court cases way out in Southwest Virginia where Judge

5    Williams decided these were contracts entered into in

6    other places and it's clear law he dealt with just

7    performance that touched Virginia.  That's the principle

8    behind it. If you want me to look them up, I can.  They

9    were in the 80's, maybe early 90's.

10          What is the date of the opinion?

11          MR. LOWRY:  I've got Production Group Intern

12    v. Goldman, in 2004.

13          THE COURT:  It was out in the coal fields,

14    one after another.

15          MR. LOWRY:  It's in our brief, but it's 337

16    F.Supp 2d. 788.

17          THE COURT:  I've been around so long I

18    remember cases by judges and not by their style.

19          MR. HOEGE:  I don't know the nature of those

20    cases. The further attenuated we get though, we would

21    say, what's the design of the other party?

22          THE COURT:  I thought you would come in here

23    and argue two points.  First, that the conduct that was

24    engaged in was di minimus and therefore not significant,

25    not substantial, not the kind of conduct that would,

1  even if existing, would hail somebody into court; and

2  secondly, that Judge Moon's interpretation of the law

3  was wrong because he gave more significance to the

4  activity that touched Virginia than the cases give.

5          MR. HOEGE:  Thank you, Your Honor. That is

6  the segue into talking about reindeer antlers.

7          THE COURT:  That is the reindeer antler

8  issue.

9          MR. HOEGE: That's right.

10          The issue there, there are two issues that I

11  would add to what you're discussing, Your Honor. One is,

12  Judge Moon does not address at all the missive from W.W.

13  Volkswagen and from Nana v. Chung that it is improper to

14  consider the unilateral actions of one party in order to

15  establish jurisdiction over the other party.

16          THE COURT:  Only if the unilateral actions

17  are the plaintiff because the forum's interest in the

18  plaintiff is never enough. They can be unilateral

19  actions on the parts of the defendant who's hauled into

20  Court in the forum state, but never the interest of the

21  plaintiff is enough to establish jurisdiction.

22          MR. HOEGE:  That's exactly right, Your

23  Honor.

24          THE COURT:  My conflicts exam over this

25  third year in law school was over this exact thing.

1          MR. HOEGE:  That's Nana v. Chung.  Chung,

2    who is a Virginia resident, contacted Alaska, Nana

3    Development.  Alaska has nothing in the world to do with

4    Virginia.  Just exactly like the Goldens have nothing in

5    the world to do with Virginia. He initiates contact with

6    them.  In that case, they actually form an agreement,

7    which is unlike our case.  In that case, they strike an

8    agreement, well, I'm going to purchase these reindeer

9    antlers from you. Nana says, you have to come here and

10   receive them in Nome, Alaska.  So Chung goes out to

11   Nome, Alaska. They can't provide all the reindeer

12   antlers.

13          THE COURT:  They're not ready.

14          MR. HOEGE:  They're not ready.

15          THE COURT:  They ain't been shot yet.

16          MR. HOEGE:  He says, ship them back to

17   Virginia, and they come back and they're delivered,

18   spoiled.

19          In that case, the initiation in that case

20   was less than what we have here in our case and the

21   formation of the agreement was greater.  In that case,

22   the Court refused to extend personal jurisdiction.

23          The line from the opinion is "the

24   significant contacts considered are those actually

25   generated by the defendant."

1           In this case, the contract was formed,

2   executed in 1987.  18 years later, Dr. Putz contacts the

3   Goldens, says, I need help with some litigation and

4   Michael Golden says, what do you want me to do and he --

5   Dr. Putz says, how about doing an affidavit? That's the

6   undisputed evidence in this case. How about you execute

7   an affidavit?

8           THE COURT:  What if the affidavit had

9   worked? Would it have been considered part performance?

10  Because it would have been the event without which it

11  would not have occurred.  Wouldn't it have been

12  proximate cause?

13          MR. HOEGE:  If it had worked, it would not

14  be part performance because if it had worked, it would

15  have established that the performance in 1987 was whole

16  and complete. The affidavit itself --

17          THE COURT:  If performance is complete, Putz

18  gets his title and y'all can't give him a title.

19          MR. HOEGE:  We have no evidence he doesn't

20  have title.

21          THE COURT:  He's alleged he has it. That's

22  all he needs to be on the substantive issue. In all

23  deference, I am not going to mix the substantive claim

24  with the issue of jurisdiction except to the extent that

25  context forms exactly where we are and whether this is

1  part performance. Now, the truth is either this is part

2  performance on the facts that are here or it's not and

3  it's either part performance because factually it is so

4  or because under the case law, it's sufficient part

5  performance to invoke the jurisdiction of the Court.

6         MR. HOEGE: And to your point earlier, we

7  would say, in the alternative, we would say first, it's

8  not part performance. In the alternative, it doesn't

9  rise to the level. Nana v. Chung and Volkswagen, as

10  well, all go to the fact that Dr. Putz drafted the

11  affidavit, he contacted the Goldens, he directed the

12  Goldens send it to Virginia and then in the end --

13         THE COURT:  We have Golden's testimony that

14  he did it of his own free will, nothing compelled him,

15  nobody held a gun to his head.  He did it to help.

16         MR. HOEGE:  Yes, Your Honor, which is

17  exactly the case in Nana v. Chung. They had a business

18  deal in that case.

19         THE COURT:  I'm not going to agree that Nana

20  v. Chung -- it is certainly decisional authority that

21  applies, but whether it controls the outcome here is a

22  different matter.  It certainly applies, but whether it

23  controls the outcome is a different matter.

24         MR. HOEGE:  Right. I guess the reason I'm

25  using it so much is --

1           THE COURT:  It's your best case.

2           MR. HOEGE:  The facts are very similar to

3   our case.

4           THE COURT:  It's your best case. That's why

5   I told her to get it the minute I got off the bench.

6           MR. HOEGE:  Yes, Your Honor.

7           So unlike Nana v. Chung where personal

8   jurisdiction was not extended and which, by the way, is

9   not addressed in Judge Moon's opinion --

10          THE COURT:  But if he's right, he's right

11  and if he's not, I have to tell him.

12          MR. HOEGE:  So we're asking that you attach

13  a reindeer antler to your recommendation to him, Your

14  Honor.

15          THE COURT:  It won't be putrefied, though.

16          Let me hear from Mr. Lowry for a moment.

17  You've made your points.

18          MR. LOWRY:  I have the greatest affection

19  and admiration for Mr. Hoege and I think he argues hard

20  and forcefully, but I think he overlooks some things in

21  both Judge Moon's opinion and in case law.

22          First of all, in saying that --

23          THE COURT:  It is hard to reverse a district

24  judge from below.

25          MR. LOWRY:  It is.  That's really manning

1   up.

2            THE COURT:  I've done it twice.

3            MR. LOWRY:  In Production Group, which is

4   the case I was talking about which comes out of the --

5   it might be out of the Eastern District -- yeah, it's an

6   Eastern District case, 2004 case, cited in our brief.

7   Here's the quote.  "The settled principle that the due

8   process analysis includes contract performance activity

9   not specifically related to the breach, coupled with the

10  settled principle that the Virginia General Assembly

11  intended the long-arm statute to reach to the limits of

12  due process compels the conclusion that 'arising from'

13  should be broadly construed to mean 'related to' so as

14  to include within transacting business any contract

15  performance activity in the forum, even if not directly

16  related to the alleged brief."

17           THE COURT:  Let me just say this.  If Judge

18  Moon was right, I will tell you this is a case at the

19  limits of due process.

20           MR. LOWRY:  It may well be.  We're not

21  saying there was a flood of activity.  We're saying

22  there was a single act and fortunately for our case,

23  Virginia is a single act, minimum contact, di minimus

24  state arising out of.

25           In looking at what Judge Moon had to say

1  beginning back at page eight, I'm going to read a little

2  bit, with your permission.

3          THE COURT:  He's piling on.  Do you throw a

4  red flag?

5          MR. LOWRY:  "After these factors, I find that

6  the defendant transacted business in Virginia sufficient

7  to satisfy long-arm statute and requirement of due

8  process.  The affidavit executed by Mr. Golden in

9  Washington and transmitted to Dr. Putz in Virginia is a

10 legal statement affirming the existence of the contract

11 and defendant's intention to perform in accordance with

12 the terms of the contract.  The allegations in the

13 complaint indicate that the contract remains to be

14 performed.  If the contract is in fact performed, it

15 appears that it will be partly performed in Virginia,

16 which is another grounds for your minimum contact."

17          Even if there had been an affidavit sent

18 here, if the Court finds, as he did, that to perform the

19 contract was going to have a nexus with Virginia, that's

20 a separate basis for finding jurisdiction in the case.

21          He found both.

22          THE COURT:  But we don't have any evidence

23 of that.

24          MR. LOWRY:  We do in the sense that --

25          THE COURT:  Of that alternative.

1          MR. LOWRY:  I think we do in the sense that

2     the party to whom the transfer has to be made is in

3     Virginia and, therefore, it has to come to him in

4     Virginia unless he's going to travel somewhere else.

5          THE COURT:  Can't it just be recorded right

6     there in whatever you want to call it, in that place?

7          MR. LOWRY:  Yes, it can be recorded in that

8     place.

9          THE COURT:  Even if it never comes to him

10     physically, right?

11          MR. LOWRY:  I don't know.

12          THE COURT:  Neither do I.

13          MR. LOWRY:  I won't stretch beyond that.

14          THE COURT:  I know it doesn't have to be in

15     Virginia.  You don't have to have the deed ever come to

16     the owner for performance to have been complete.

17          MR. LOWRY:  That's certainly true in

18     Virginia, although I do know in some countries, you do

19     have to hold your title in your hands and I don't know

20     about French Polynesia.

21          Then over at page eleven when he's wrapping

22     up, he's stating, "defendant's purposefully directed

23     their activity toward Virginia and established

24     sufficient minimum contact such as they reasonably could

25     have anticipated being sued in a Virginia court by a

1   Virginia citizen and resident over a contractual

2   obligation that allegedly remains unfilled and if

3   performed will require at least partial performance in

4   Virginia. Under due process principles, personal

5   jurisdiction may be conferred for a specific cause of

6   action not only by the acts giving rise to the claim,

7   but by acts related to the claim itself."

8           Then he cites Burger King and Precepts

9   Medical Products v. Klus.

10          THE COURT:  That's Judge Moon.

11          MR. LOWRY:  That's Judge Moon's opinion. He

12   also cites Production Group, which I just read to you

13   from.

14          THE COURT:  That's the Eastern District

15   case.

16          MR. LOWRY:  "Where the defendant has created

17   continuing obligations between himself and residents of

18   the forum, he manifestly has availed himself of the

19   privilege of conducting business there,"  and that's a

20   quote from Production Group Intern.

21          He did not limit and focus his decision on

22   what the Court in Polynesia had to say. For purposes of

23   my argument right there, let's assume the Court in

24   Polynesia did not rule one way or the other because at

25   best, that's all they did, even under their

1   interpretation.  They just said you'll have to do

2   something more, go back to court.  So if they didn't

3   ever rule on anything -- and I will tell you after

4   having read the translation, his interpretation of it is

5   as credible as my interpretation of it.

6             THE COURT:  You're talking about Mr.

7   Hoege's. Yes, I agree.

8             MR. LOWRY:  I could clearly be wrong on

9   that, but I clearly believe it doesn't make a bit of

10  difference because that's not the issue.

11            THE COURT:  Let me ask you this.  Both of

12  y'all think about this. What if the French Polynesia

13  Court just dismissed the case and said y'all work it

14  out, we're not going to touch it because there's enough

15  patronage down there to sink a ship.  They think SCIP

16  won't do anything.

17            MR. LOWRY:  Under their interpretation of

18  the rulings that's where we're at because --

19            THE COURT:  Not adding on the patronage

20  thing.

21            MR. LOWRY:  Under their interpretation of

22  the ruling, the lower court said "I don't have

23  jurisdiction," but they also said "I dismiss Panonia's

24  claim." The upper court, under their interpretation,

25  said "you did have jurisdiction.  So we're quashing your

1   order."  Under their interpretation, nothing happened

2   after that.  So we're really at what you just posited

3   there.  If they're right, there's no ruling by the

4   Polynesian courts, one way or the other on this issue,

5   but there is SCIP's saying we don't recognize the

6   transfer.  That was a part of the proffer.  We're at a

7   jurisdictional stage and I think the question before the

8   Court is this:  Did Dr. Golden voluntarily, pursuant to

9   his obligation under the contract, send an affidavit to

10  Virginia?  Period.  End of inquiry, as far as I'm

11  concerned.

12              THE COURT:  Mr. Hoege?

13              MR. HOEGE:  I've got a bunch of things to

14  fire back, Your Honor.  I will pick up with that with

15  respect to the proffer because the assertion is that

16  there's evidence that the SCIP refused to allow the

17  transfer.

18              THE COURT:  The one thing we're not going to

19  do is receive a proffer by agreement. I understand where

20  your disagreement came and then to try to change what

21  the proffer is.  It's going to be accepted.  We've got

22  to go to what the proffer is except as to the testimony

23  of Dr. Golden with respect to the events surrounding his

24  execution and mailing of the affidavit to Dr. Putz.

25  That was the only place where y'all disagreed.

1          MR. HOEGE:  Your Honor, respectfully, on the

2    day of the hearing, I was handed three documents, one of

3    which I'd seen before because it was Exhibit D of the

4    complaint. The other two were the book end orders in the

5    Polynesian Court.  That caused me to read all three

6    documents together. I accepted on behalf of the Goldens

7    the proffer that SCIP refused to recognize title based

8    on the fact that there is a representation in the

9    complaint that the Court made factual findings that the

10   SCIP had refused title.  We came here today and I

11   believe I've shown where that representation was false.

12   I'm not saying knowingly so.  I'm not saying anything

13   like that, but that is not the case. So I accepted it

14   based on the documents that I had when we started the

15   proffer.

16          Now it may be that that's determined to be

17   irrelevant, but I believe that -- I just bring it up

18   because Mr. Lowry just said it's part of the proffer

19   that the SCIP denied it and I'm just clarifying I

20   accepted that proffer based on a misrepresentation on

21   the plaintiff's complaint.

22          MR. LOWRY:  If the Court wants me to put Dr.

23   Putz on the stand to say that SCIP refused the delivery,

24   I'll be glad to do it.

25          THE COURT:  I'm not driving the case. You do

1    what you feel you have to do and he'll have to do what

2    he feels he has to do and I'll rule in a way I feel like

3    I have to rule. That's the way we've got to work this.

4              MR. HOEGE: Your Honor, I stand before you,

5    unfortunately, not being able to recall the facts of

6    Production Group. I would like to know whether or not

7    -- who the parties in Production Group are, whether or

8    not they're --

9              THE COURT: I'll read the case.

10             MR. HOEGE: Whether they're Virginia

11   companies or not.

12             I would also ask the Court to consider

13   whether or not the contract was formed at a time that

14   the companies were -- at least one of the companies was

15   a resident of Virginia because that is not the case and

16   our contacts are di minimus because the entire contract

17   formation and the entire contract execution minus the

18   performance rather, minus the allegations that the

19   affidavit might be part performance, was conducted while

20   none of the parties had anything at all to do with

21   Virginia and there was zero contact with Virginia.

22             I understand we're reading these principles

23   extracted from cases, but in the end, you have to apply

24   the facts to that law. So Production Group, I would

25   suspect, has greater contacts than our contacts in our

1   case, than the present case.

2           Three other points, Your Honor.

3           First, the affidavit evidences zero

4   intention.  There is no evidence that Mr. Golden

5   intended to do any business at all in Virginia by

6   executing the affidavit.

7           THE COURT:  The finding of Judge Moon was

8   simply this. The execution of the affidavit in

9   Washington sent to Virginia was the act of performance.

10  The performance was sending it to Dr. Putz who, in turn,

11  according to what Judge Moon knew then and actually

12  according to the evidence here, was intended to go

13  somewhere else.

14          MR. HOEGE:  That's right.

15          THE COURT:  There's no dispute over that,

16  Mr. Hoege.

17          MR. HOEGE: That's right.  But, Your Honor,

18  the reason it's important --

19          THE COURT:  So his findings basically are

20  based on the facts that he perceived to exist that

21  actually do exist with respect to the actual conduct

22  that occurred.

23          MR. HOEGE:  But a contact is not enough,

24  right? Again, quoting from Consulting Engineering, "the

25  defendant purposefully availed himself of the privilege

1    of conducting business under the laws of the forum

2    state."

3             THE COURT:  Listen carefully.  Judge Moon

4    said if those facts that he found were the preponderance

5    of the evidence, he found that to be sufficient under

6    these decisional authorities.  That was his application

7    of the law to the facts.  So I go back to the original

8    thing.  It appears as though there's no difference from

9    the hearing from his opinion concerning what actually

10   happened.  The only question now becomes whether his

11   application of the law was appropriate.

12            MR. HOEGE:  Right, which is my double point

13   here.

14            THE COURT:  That just narrows down my

15   decision making.

16            MR. HOEGE:  Which is my double point, Your

17   Honor, which is we cannot identify and Judge Moon did

18   not address what business Dr. Golden sought to conduct

19   in Virginia, number one.

20            THE COURT:  It doesn't have to.  He said

21   that Dr. Golden's activity was part performance of what

22   he'd already agreed to do, according to the allegations,

23   substantive allegations in the complaint as to what the

24   contract was, as to it's failure to be completed and as

25   to what might be required of Dr. Golden in order to

1  complete the contract or be in breach.

2         MR. HOEGE:  But respectfully, you just said

3  yourself, Your Honor, that by sending the affidavit to

4  Virginia, the intention -- we could call it part

5  performance, that's fine, but the part performance was

6  not to happen in Virginia.

7         THE COURT:  No, there's --

8         MR. HOEGE:  It was to happen in Tahiti.

9         THE COURT:  That isn't what Judge Moon

10  found. Judge Moon found the contact between Washington

11  and Virginia constituted part performance. The rest of

12  it was going to happen somewhere else.  Then the

13  question becomes, is that significant enough to meet due

14  process standards?  That's his application to the law on

15  the facts and you disagree with that.

16         MR. HOEGE:  In the facts, my second point

17  then, I'll leave that one, is that we don't know what

18  law would have been invoked, under what protection, the

19  protection of what law.

20         THE COURT:  And you say that's important and

21  Mr. Lowry says it's not important because performance

22  hasn't occurred and they were trying to do everything to

23  get it to be done.  Completion of the contract had not

24  occurred.

25         MR. HOEGE:  The way to look at that is when

1    the affidavit arrives in Virginia, what in the world,

2    and there is no evidence, there is no law presented that

3    indicates that when that affidavit lands in Virginia, it

4    has --

5              THE COURT:  Let me ask you this. What if

6    somebody contracted for the shipment of goods from St.

7    Louis, Missouri to New York City and it happens to be

8    that the route that is designed comes through the

9    Commonwealth of Virginia where there has to be a

10   transfer of the goods from one truck to another in order

11   to partially perform? Would that be sufficient to hail

12   the trucker, trucking company, into Virginia for failing

13   to fully perform the contract?

14             MR. HOEGE:  If it was in the terms of the

15   contract -- well --

16             THE COURT:  Let's say it wasn't. Let's just

17   say the contract says you're to get these goods from St.

18   Louis to New York, but as part of the operating

19   procedures, they have to change trucks in Virginia.

20             MR. HOEGE:  Meaning the trucking company --

21   the inference from your facts, Your Honor, is that the

22   trucking company --

23             THE COURT:  Your argument is that Virginia

24   was only a conduit and it wasn't a sufficient conduit to

25   constitute a contact for purposes of due process.

1          MR. HOEGE:  And I'd say it's not a true

2     analogy.

3          THE COURT:  That's just arguing with Judge

4     Moon's conclusion.

5          MR. HOEGE:  The trucking company does

6     regular business, so the inference from your set of

7     facts is that there's this standing company that this is

8     the route it goes through.

9          THE COURT:  Let's assume the company has no

10    contact with Virginia except to make a switch of the

11    trucks because it's going to switch from one truck to

12    another.  I'm trying to do the conduit.

13         MR. HOEGE:  So let's say that the two guys,

14    like the one truck is coming up from Florida and it just

15    so happens the most convenient place to meet is Virginia

16    and there's no other contact between the trucking

17    company and the State of Virginia, but they stop here.

18         THE COURT:  Except here, the affidavit had

19    to come to Virginia because that's the only way it was

20    going to get from Putz to the court in French Polynesia.

21    We've got --

22         MR. HOEGE:  I would say in your factual

23    scenario, I would say, Your Honor, that that would be

24    insufficient contact.

25         THE COURT:  Your argument is that if

1  Virginia was only a conduit, it's not sufficient.

2  That's all.  It's not that it didn't occur. You're not

3  arguing that it doesn't occur. You're only arguing the

4  sufficiency for due process purposes.

5          MR. HOEGE:  That's right.

6          THE COURT:  That's where I was when we

7  started this.  You're five points to the contrary.

8  That's exactly where we wind up.

9          MR. HOEGE:  If I might, Your Honor.

10          THE COURT:  One more point.  I've given you

11  more time than you'll get in the Court of Appeals.

12          MR. HOEGE:  You directed us to consider

13  Consulting Engineering Corporation is not addressed in

14  Judge Moon's opinion. That's why I'm, again, asking you

15  to apply this law because you directed us to it.

16          The quote, after the factors about testing

17  the first prong of the three-part test for applying

18  personal jurisdiction, specific personal jurisdiction,

19  in the paragraph, the first full paragraph on page

20  eight, the opinion says, "because the defendant's

21  activities are shielded by the benefits and protections

22  of the forum's laws, it is presumptively not

23  unreasonable to require him to submit to the burdens of

24  litigation in that forum as well," and they're quoting

25  Burger King.

1        In this case, again, nothing about the

2   affidavit -- this is the conduit argument, and I'm

3   trying to go beyond your factual conclusion that the

4   conduit is insufficient and reach the application of the

5   law here, which is to say, please consider the fact that

6   there are no Virginia laws that protect or shield the

7   Goldens, vis-a-vis this affidavit.

8        THE COURT:  Look.  Here's what Consulting

9   Engineer says. Here are the factors.

10       One, whether the defendant maintains offices

11  or agents in the forum state.

12       Answer:  No.

13       Whether the defendant owns property in the

14  forum state.

15       Answer: No.

16       Whether the defendant reached into the forum

17  state to solicit or initiate business.

18       Answer:  No.

19       Whether the defendant deliberately engaged

20  in significant or long term business activities in the

21  forum state.

22       There is a question mark there because it's

23  whether there was a deliberate engagement in significant

24  activity.  So there's a question mark there.  That's one

25  that we have to answer.

1              Next, whether the parties contractually

2    agreed that the law of the forum state would govern the

3    disputes; no.

4              Next, whether the defendant made in person

5    contact with the residents of the forum in the forum

6    state regarding the business relationship.

7              Question mark; affidavit.

8              Third, the nature and quality and extent of

9    the parties' communication about the business being

10   instructed.

11             I had a question there.

12             And finally, whether the performance of

13   contractual duties was to occur within the forum state.

14             That's where Judge Moon came down.  He said

15   that's a yes.  That was the factor that tipped the

16   scales. There was the performance of contractual duties

17   within the forum state.

18             MR. LOWRY:  And there was contact between

19   the parties.

20             THE COURT:   And there was contact between

21   the parties that occurred in the forum state.

22             MR. HOEGE:  If I may, Your Honor, the

23   contact is in person contact, the last bullet on that

24   page.

25             THE COURT:  And that's no.

 1              MR. HOEGE:  That's a no.  I want to be clear

 2    on that.

 3              THE COURT:  But deliberately engage in

 4    significant activities, and that's the other question.

 5    Was this significant activity?  Those are the question

 6    marks.  That's why I asked you to consider that case.

 7    It just lays out all of the factors.

 8              MR. LOWRY:  I get the last word?

 9              THE COURT:  You have the burden and this is

10    the last of the last words.

11              MR. LOWRY:  Thank you.

12              I thought I just heard the first arguments

13    repeated all over again but I still say you've got to

14    get down to asking if anything has changed from what

15    Judge Moon said.

16              THE COURT:  I know.

17              MR. LOWRY:  The first thing he said was the

18    affidavit executed by Golden in Washington and

19    transmitted to Putz in Virginia is a legal statement

20    affirming the existence of the contract and defendant's

21    intention to perform in accordance with the terms of the

22    contract.  That has not changed during the course of

23    this evidentiary hearing.

24              The allegations of the complaint indicate

25    that the contract remains to be performed.  That has not

1  changed.  If the contract is in fact performed, it

2  appears that it will be partly performed in Virginia,

3  what you were just saying from looking at the case.

4          Given Dr. Putz's citizenship and residency

5  here --

6          THE COURT:  The point here is it doesn't

7  matter whether it's been performed.  It's alleged not to

8  have been.

9          MR. LOWRY:  That's right.  The issue in the

10  case will be was it performed.

11          THE COURT:  Exactly.

12          MR. LOWRY:  Then in the next paragraph,

13  significantly, partial performance of a contract may

14  confer jurisdiction pursuant to the Virginia long-arm

15  statute even though the partial performance is not

16  specifically related to the alleged breach itself.

17          THE COURT:  Right.  That's where Judge Glen

18  Williams of the Western District wrote a series of cases

19  back in either the 80's or 90's about what is partial

20  performance and jurisdiction.  There were at least two

21  or three of them.

22          MR. LOWRY:  I'm not going to beat a dead

23  horse. I don't see what has changed.

24          THE COURT:  That's your position.

25          MR. LOWRY:  With the possible exception of

1  an interpretation of the opinion in Bora Bora, and I

2  want to say in fact for the record and to Mr. Hoege,

3  who's opinion I value highly, that the English

4  interpretations, we didn't have when we filed the

5  pleadings.  We got them shortly -- our firm received

6  them shortly before the last hearing.  It wasn't

7  something we were holding back on.  They are subject to

8  argument as to what they mean, but I don't think they're

9  relevant to the jurisdictional hearing.

10            THE COURT:  I'll render an opinion in

11  writing.  If probably won't be until after the Fourth

12  Circuit judicial conference, which is this week.  I will

13  get to that as soon as I can.

14            That concludes these proceedings but it

15  doesn't conclude our being here for a couple minutes.

16  These proceedings are recessed.

17

18

19  "I certify that the foregoing is a correct transcript

20  from the record of proceedings in the above-entitled

21  matter.

22

23

24  /s/ Sonia Ferris                    October 23, 2009"

25

1                              **INDEX**

2    **Exhibit No.**            **Marked**            **Admitted**

3    Joint #1                   5                     5

4    Joint #2                   5                     5

5    Joint #3                   5                     5

6    Joint #4                   5                     5

7    Joint #5                   5                     5

8    Joint #5A                  5                     5

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25